990 F.2d 1217
 61 Fair Empl.Prac.Cas. (BNA) 1301,
62 Empl. Prac. Dec. P 42,381
Bill CLARK; Herbert Futch; Austin Hurst; Louis Sliker and
William Barrineau, Plaintiffs-Appellants,
v.
COATS & CLARK, INC., Defendant-Appellee.
 No. 92-8024.
 United States Court of Appeals,
Eleventh Circuit.
 May 17, 1993.
Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Oct. 29, 1992.
 
 Kent Spriggs, Mary O'Rourke, Spriggs & Johnson, Tallahassee, FL, for plaintiffs-appellants.
 Rosemary C. Lumpkins, William K. Principe, Constangy, Brooks & Smith, Atlanta, GA, for defendant-appellee.
 Appeal from the United States District Court for the Middle District of Georgia.
 Before COX and DUBINA, Circuit Judges, and GODBOLD, Senior Circuit Judge.
 GODBOLD, Senior Circuit Judge:
 
 
 1
 This is an employment discrimination case between Coats & Clark, Inc. and five of its former employees. Each of the five employees, Hurst, Futch, Barrineau, Sliker, and Clark contends that Coats & Clark discharged him in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140. Clark also asserts that he was forced to retire in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626(b), and that, under Georgia law, his involuntary retirement constituted intentional infliction of emotional distress. The district court granted summary judgment to Coats & Clark on all claims. We affirm the grant of summary judgment on appellants' ERISA claims and Clark's intentional infliction of emotional distress claim. As to Clark's ADEA claim, we reverse the grant of summary judgment and remand for further proceedings.
 
 I. BACKGROUND
 
 2
 Appellants were all employed at Coats & Clark's Thomasville, Georgia thread mill and left that employment between December 1983 and October 1985. During that time period the total number of people working at the mill was in flux. Between January 1983 and May 1985 it decreased from 278 to 205, but then it began to increase, reaching 225 by October 1985 and eventually peaking at 292 in July 1988. The reductions between 1983 and early 1985 were not limited to hourly workers. In late 1983 Coats & Clark conducted an evaluation of all its salaried personnel and positions, resulting in a proposal by plant manager Richard Bradner to eliminate several salaried workers and/or their positions. Because the appellants held different positions and were terminated at different times during this period the circumstances surrounding each termination must be examined individually.
 
 A. Thomas Austin Hurst
 
 3
 On December 30, 1983 Coats & Clark terminated Hurst after 26 years of service. Hurst had served in his final position as twisting supervisor for roughly 13 years. He had heart surgery in 1979 but had continued to work. Coats & Clark told him that, as part of the 1983 proposal to eliminate some of the plant's salaried positions, his job was being eliminated and combined with that of another supervisor to create one salaried position. His pension had vested, thus his termination deprived him only of the ability to accrue additional benefits.
 
 B. Herbert Futch
 
 4
 Futch worked for Coats & Clark for 21 years, the last nine as a supervisor. Futch was also terminated December 30, 1983 as part of the 1983 proposal to reduce salaried personnel. His duties were split between a salaried employee and an hourly employee. Futch's benefits had vested so his discharge only prevented him from accruing additional benefits.
 
 C. William Barrineau
 
 5
 Barrineau was terminated in March 1985 during a general reduction in the workforce. He worked at Coats & Clark as an hourly employee for 25 years, thus his pension benefits had vested. Barrineau has not provided any other details concerning his termination except his assertion that he was not given a reason for his discharge.
 
 D. Lewis Sliker
 
 6
 Sliker was terminated as supply room clerk March 27, 1985 during a general reduction in the workforce. At the time of termination he had been employed at Coats & Clark nine years and three months, so his benefits were nine months shy of vesting. After 10 years of employment, Sliker would have been entitled to receive a lump sum of $939.75 or monthly payments of $14.10. Because Sliker's pension had not yet vested, however, Coats & Clark did not pay him any benefits upon termination. Sliker's assertion that he was replaced by another worker is unsupported. Instead, the record convincingly demonstrates that his job was eliminated and his duties divided between two maintenance mechanics.
 
 E. Bill Clark
 
 7
 Clark contends that he was forced to accept early retirement in violation of both ERISA and ADEA. Also he has asserted a pendent state law claim for intentional infliction of emotional distress. Clark worked for Coats & Clark for 38 years, the last 25 at the supervisor level and above. His last position was department manager of preparation and spinning. Coats & Clark transferred Clark into that position in January 1984 after his former position as assistant plant manager was eliminated. The parties do not agree why Clark left Coats & Clark's employment. Coats & Clark contends that Clark voluntarily chose to accept early retirement. Clark asserts that, just as he was going home on October 31, 1985, he was called into the plant manager's office and told by plant manager Bradner and personnel administrator Jess Ferrell that Coats & Clark wanted him to accept early retirement effective immediately. He refused and Bradner told him that he had to accept early retirement. Clark was then 58 years old.
 
 
 8
 It is agreed that after the meeting Clark collected his personal belongings, left the plant, and is now receiving early retirement benefits. Clark contends that he, unlike other retirees, did not receive a going away party, retirement gift, or service plaque. He further contends that since October 31, 1985 he has suffered from severe depression.
 
 
 9
 Although Coats & Clark says that Clark lost his job as part of a workforce reduction, the number of employees at the Thomasville plant increased by 18 during October 1985 and by two more in November 1985. In addition, Bradner stated that Jim Cauthen, age 27 at the time, took over Clark's position as department manager of preparation and spinning, Bradner Dep., at 83, and further stated that Cauthen actually had fewer responsibilities than Clark. See id. at 86.
 
 II. PROCEDURAL HISTORY
 
 10
 This is the third time we have addressed this case. In the first appeal we reviewed the district court's order dismissing all claims except Clark's ERISA claim. Clark v. Coats & Clark, Inc. (Clark I), 865 F.2d 1237, 1239 (11th Cir.1989). We concluded that Clark had filed a timely charge with the Equal Employment Opportunity Commission concerning his ADEA claim and therefore reversed the dismissal of the ADEA claim. Id. at 1245. Based on the statute of limitations, we affirmed the dismissal of the claims of Hurst, Futch, Barrineau, and Sliker under ERISA for recovery of wages but held that their ERISA claims for reinstatement of employment and pension rights were not barred. Id. We also held that ERISA did not preempt Clark's emotional distress claim. Id.
 
 
 11
 On remand from Clark I the district court granted summary judgment to Coats & Clark on all claims. It held that all of the employees had failed to establish a prima facie case that their terminations violated ERISA, and that Hurst, Futch, Barrineau, and Sliker had no cause of action under ERISA because, as vested employees, they only lost the right to accrue additional benefits. The court held that Clark also had not established a prima facie case that he was forced to retire in violation of ADEA, and, even if he had, would not be able to demonstrate pretext. It further held that the exclusive remedies provision of the Georgia Workers' Compensation Act, O.C.G.A. § 34-9-11 (Michie 1992), precluded consideration of Clark's intentional infliction of emotional distress claim, and, if it could be considered, summary judgment was proper because Coats & Clark's conduct was not extreme and outrageous.
 
 
 12
 In Clark v. Coats & Clark, Inc. (Clark II), 929 F.2d 604 (11th Cir.1991), we reviewed the grant of summary judgment and reversed without addressing the merits because it appeared that the district court had not found that Coats & Clark met its initial burden of demonstrating the absence of any genuine issue of material fact under Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). See Clark II, 929 F.2d at 608-09. On remand the district court held that Coats & Clark had met its initial burden of demonstrating the absence of a genuine issue of material fact, that the employees had not shown the existence of a material issue of fact, and reaffirmed its earlier grant of summary judgment. It also denied the employees' motion requesting the judge to recuse himself pursuant to 28 U.S.C. § 455.
 
 
 13
 All five employees appeal from the grant of summary judgment on their ERISA claims, and request that, in the event of a remand, the case be reassigned to another judge. Clark also appeals from the grant of summary judgment on his ADEA and intentional infliction of emotional distress claims.
 
 III. STANDARD OF REVIEW
 
 14
 We review a district court's grant of summary judgment de novo, applying the same legal standards as the district court. Owens v. Storehouse, Inc., 984 F.2d 394, 397 (11th Cir.1993).
 
 IV. DISCUSSION
 A. ERISA Claims
 
 15
 All five appellants contend that their terminations violated § 510 of ERISA, 29 U.S.C. § 1140. Section 510 makes it unlawful
 
 
 16
 to discharge ... a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled.
 
 
 17
 Id. Coats & Clark first asserts that because the pensions of Barrineau, Futch, Hurst, and Clark were vested, their only loss was the ability to accrue additional benefits, which is unprotected by § 510. It also asserts that, if the appellants have a cause of action, the district court correctly found that they had all failed to establish a prima facie case.
 
 
 18
 In Seaman v. Arvida Realty Sales, 985 F.2d 543 (11th Cir.1993), we held that an employee who alleged that she had been terminated to prevent her from obtaining additional non-vested benefits under a plan covered by ERISA had stated a valid cause of action under § 510. Id. at 546. We noted our agreement with Conkwright v. Westinghouse Electric Corp., 933 F.2d 231 (4th Cir.1991), which held that Congress did not intend to leave employees unprotected once their rights were vested, and that § 510 prohibits the employer from discharging an employee for the purpose of preventing the employee from receiving additional vested benefits. Seaman, 985 F.2d at 545-46 (discussing Conkwright, 933 F.2d at 238). Section 510 therefore protects the right of Barrineau, Futch, Hurst, and Clark to accrue additional vested benefits, as well as Sliker's right to become a vested employee.
 
 
 19
 The district court concluded that summary judgment was proper because all of the appellants had failed to establish a prima facie case that their terminations violated § 510. The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights. Id. at 546; Owens, 984 F.2d at 399. A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of a discharge. Arvida, 985 F.2d at 546. This burden can be met either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and restated in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981). Gavalik v. Continental Can Co., 812 F.2d 834, 851-53 (3d Cir.) (en banc), cert. denied, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987).
 
 1. Direct Evidence
 
 20
 Evidence is direct when it is sufficient to prove discrimination without inference or presumption. Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir.1989). Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence. Id. at 582. In the face of direct evidence of discrimination the defendant must prove that the same employment decision would have been made absent any discriminatory intent. Id.
 
 
 21
 The appellants rely upon two exhibits as direct evidence of discrimination: (1) a document calculating that Coats & Clark would save $105,894.66 if a 57 year-old employee named Carl Maloy accepted early retirement instead of continuing to work until age 65, and (2) a document calculating that if appellant Clark accepted early retirement rather than working until age 65 the savings to Coats & Clark would be $173,092.08. The documents do not specify why Coats & Clark would save money if the two men accepted early retirement or indicate that either man would be terminated if he refused to accept early retirement.
 
 
 22
 Neither document constitutes direct evidence. The document concerning Maloy does not refer to any of the appellants and therefore cannot be direct evidence of an intent to interfere with the appellants' ERISA rights. The second document concerns appellant Clark, but a mere calculation of the amount of money Coats & Clark would save if Clark accepted early retirement is not direct evidence of Coats & Clark's motivation for terminating Clark. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1082 (11th Cir.1990). Appellants therefore have not pointed to any direct evidence that Coats & Clark terminated them for the purpose of interfering with their ERISA rights.
 
 2. McDonnell Douglas
 
 23
 The McDonnell Douglas scheme first requires the plaintiff to demonstrate by the preponderance of the evidence a prima facie case of discrimination. Burdine, 450 U.S. at 252-53, 101 S.Ct. at 1093-94. If the plaintiff does so, a presumption of discrimination is created, and the defendant must articulate a legitimate nondiscriminatory reason for its conduct. Id. at 253, 101 S.Ct. at 1093. If the defendant provides an acceptable reason for its conduct, the presumption of discrimination disappears, and the plaintiff must demonstrate that the reason given was a mere pretext for discrimination. Id.
 
 
 24
 The burden of establishing a prima facie case is not onerous. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093. In the context of a § 510 claim alleging unlawful discharge, a plaintiff may establish a prima facie case of discrimination by showing (1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. Turner v. Schering-Plough Corp., 901 F.2d 335, 347 (3d Cir.1990); Dister v. Continental Group, Inc., 859 F.2d 1108, 1114-15 (2d Cir.1988).[1] To satisfy the last element the plaintiff does not have to prove discriminatory intent but must introduce evidence that suggests interference with ERISA rights was a motivating factor. Turner, 901 F.2d at 348. The plaintiff, however, cannot establish a prima facie case merely by showing that, as a result of the termination, he was deprived of the opportunity to accrue more benefits. Id.; Clark v. Resistoflex Co., 854 F.2d 762, 771 (5th Cir.1988). Moreover, measures designed to reduce costs in general that also result in an incidental reduction in benefit expenses do not suggest discriminatory intent. Unida v. Levi Strauss & Co., 986 F.2d 970, 979 (5th Cir.1993); see also Conkwright, 933 F.2d at 239. Instead, the employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular. See Unida, 986 F.2d at 979. One way for the employee to satisfy this burden is to show that his termination resulted in a substantial savings in benefit expenses. See Dister, 859 F.2d at 1115 (termination four months prior to vesting of enhanced pension plan resulting in $550,000 savings created inference of discrimination).
 
 
 25
 Coats & Clark does not dispute that all appellants were participants in a plan covered by ERISA and therefore entitled to its protection. Nor does it contest the appellants' qualifications for their positions. But it asserts that all of the appellants failed to introduce evidence that would suggest their terminations were motivated by a desire to interfere with the appellants' ERISA rights. Because the appellants' terminations were unrelated we must examine the circumstances surrounding each release.
 
 
 26
 a. Thomas Austin Hurst
 
 
 27
 Hurst and his position were terminated as part of the 1983 streamlining proposal. The streamlining proposal resulted in the number of salaried positions being reduced from 22 to 16. Salaried personnel were also reduced by six, as follows: one employee who had died was not replaced, two employees were offered early retirement, and Hurst and two other employees were terminated. Hurst contends that the streamlining proposal creates an inference of discriminatory intent because he and the other terminated employees were farther into the pension plan than many of the retained employees, thus their termination resulted in a substantial savings in benefit expenses. But Hurst has not introduced any evidence demonstrating that, by terminating Hurst and other senior employees, Coats & Clark obtained a significant reduction in its benefit expenses. As Hurst points out, he and the other senior terminated employees were entitled to receive more pension benefits upon termination than the less-senior retained employees. Because Coats & Clark would be required to pay Hurst and the other senior employees higher pensions upon termination than less-senior employees, their termination, at least in the short run, actually increased Coats & Clark's pension expenses. Moreover, Hurst has not shown that, relative to other employees, his termination resulted in reductions to other benefit expenses that would offset the higher pension payments. Finally, Hurst's duties were combined with another supervisor's to create one salaried position entitled to participate in the same benefit and pension plans as Hurst. The streamlining proposal is indicative of an attempt to cut costs in general rather than interference with the employees' ERISA rights.
 
 
 28
 Hurst's heart problems also fail to create an inference of discriminatory intent. Hurst's heart surgery in 1979 is too remote from his termination on December 30, 1983 to support an inference that he was fired to prevent him from collecting health benefits. Nor is the fact that, between 1982 and 1983, three other employees out of a workforce of over 200 experienced heart problems sufficient to make such an inference reasonable. The circumstances surrounding Hurst's termination do not suggest that Coats & Clark intended to interfere with his ERISA rights. Accordingly, he has failed to establish a prima facie case under § 510.
 
 
 29
 b. Herbert Futch
 
 
 30
 Futch was also terminated December 30, 1983 as part of the proposal to reduce salaried personnel. His duties were split between a salaried employee and an hourly employee. Like Hurst, Futch has not shown circumstances suggesting that his termination was motivated by a desire to interfere with his ERISA rights rather than an attempt to cut costs in general. That Futch's duties were assigned in part to an hourly employee entitled to less benefits does not represent a significant enough reduction in Coats & Clark's benefit expenses to suggest that Futch was terminated to prevent him from accruing more benefits. We therefore conclude that Futch has failed to establish a prima facie case of a § 510 violation.
 
 
 31
 c. William Barrineau
 
 
 32
 Barrineau was terminated during a workforce reduction in March 1985. He has not provided any other details concerning his termination except his assertion that he was not given a reason for his discharge. Nevertheless, he contends that the circumstances of his termination suggest discriminatory intent because almost half of the 36 workers terminated during the 1985 workforce reduction were over the age of 40, and also because, beginning in October 1985, the number of employees at the Thomasville plant began to increase.
 
 
 33
 As discussed above, the fact that many of the terminated employees were vested does not alone suggest that the discharges were motivated by a desire to interfere with the employees' ERISA rights. Indeed, because Coats & Clark must pay vested employees benefits upon termination, the fact that it released a substantial number of vested employees indicates that the terminations were not discriminatory. In addition, the fluctuations in the total number of employees at the Thomasville plant do not create an inference of discriminatory intent. Coats & Clark's decision to hire more workers in October 1985, does not by itself suggest that its decision to reduce the workforce in March 1985 was motivated by discriminatory intent. Barrineau has not shown that the newly hired workers participated in a different benefits plan, or otherwise produced any evidence that would suggest the 1985 reductions were intended to interfere with the employees' ERISA rights. Instead, the appellants' evidence concerning the 1985 workforce reduction suggests that it was a legitimate attempt to cut costs in general. Barrineau thus has failed to establish a prima facie case of a § 510 violation.
 
 
 34
 d. Lewis Sliker
 
 
 35
 The circumstances surrounding Sliker's release do not give rise to the inference that Coats & Clark terminated him to interfere with his ERISA rights. Although Sliker was terminated only nine months prior to the time his pension would have vested, vesting would only have obligated Coats & Clark to pay him a lump sum of $939.75 or monthly payments of $14.10. This does not constitute a reduction in benefit expenses significant enough to create, by itself, an inference that Sliker's termination was motivated by discriminatory intent. See Turner, 901 F.2d at 348. Moreover, Coats & Clark assigned Sliker's duties to two current employees rather than replacing him with a new employee. The elimination of Sliker's position during a workforce reduction also indicates that the loss of his pension benefits was only incidental to, rather than a purpose for, his termination. Because Sliker's release did not result in a significant savings in benefit expenses, and the circumstances of his termination do not otherwise suggest that Coats & Clark intended to interfere with his ERISA rights, we hold that he has failed to establish a prima facie case of a § 510 violation.
 
 
 36
 e. Bill Clark
 
 
 37
 Despite the parties' fundamental difference over the circumstances surrounding Clark's exit he has not produced any evidence suggesting that he was forced into retirement for the purpose of interfering with his ERISA rights. Because Clark had been employed at Coats & Clark for 38 years his benefits were heavily vested. Indeed, assuming that he was involuntarily retired, he has not provided any evidence indicating that his release enabled Coats & Clark to reduce its benefit expenses, or that his replacement accrued benefits at a slower rate. Even assuming that Clark was forced to retire and Coats & Clark has misrepresented the circumstances of his departure, the evidence does not suggest that Clark was discharged to interfere with his ERISA rights. Accordingly, he has failed to establish a prima facie case of a § 510 violation.
 
 
 38
 f. Conclusion
 
 
 39
 None of the appellants introduced evidence suggesting that Coats & Clark discharged him for the purpose of interfering with his ERISA rights. Accordingly, each failed to establish a prima facie case, and the grant of summary judgment to Coats & Clark on appellants' ERISA claims is due to be affirmed.
 
 B. Clark's ADEA Claim
 
 40
 Clark contends that he was forced to accept early retirement in violation of ADEA, 29 U.S.C. § 623(a)(1). In an unlawful discharge case the plaintiff must ultimately prove by the preponderance of the evidence that age was a determining factor in the employer's decision to fire him. Carter, 870 F.2d at 581. Initially, however, the plaintiff has the burden of establishing a prima facie case. This may be accomplished by presenting direct evidence of discriminatory intent; by satisfying the McDonnell Douglas scheme; or by statistical proof. Id.; see also Earley, 907 F.2d at 1081. Clark asserts that he has presented both direct proof of discrimination and satisfied the McDonnell Douglas scheme.
 
 1. Direct Evidence
 
 41
 Clark has not introduced direct evidence that he was forced to retire because of his age. As in the ERISA context, evidence of age discrimination is direct when, if believed, it establishes discriminatory intent without inference or presumption. Earley, 907 F.2d at 1081. Only the most blatant remarks whose intent could only be to discriminate on the basis of age constitute direct evidence. Id. Even accepting Clark's version of his final day, there is no evidence of this type. According to Clark, Bradner told Clark that he had to retire but did not say why he had to retire. If Clark's version is accepted there is direct evidence that he was involuntarily retired, but the discriminatory intent motivating that decision must be inferred. See Young v. General Foods Corp., 840 F.2d 825, 831 (11th Cir.1988), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989).
 
 2. McDonnell Douglas
 
 42
 To establish a prima facie case of age discrimination under the McDonnell Douglas scheme this court requires a plaintiff to show that he:
 
 
 43
 (1) was a member of the protected group of persons between the ages of 40 and 70, (2) was subject to adverse employment action, (3) was replaced with a person outside the protected group, and (4) was qualified to do the job.
 
 
 44
 Mitchell v. Worldwide Underwriters Ins. Co., 967 F.2d 565, 566 (11th Cir.1992); see also Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1469-70 (11th Cir.1991); Earley, 907 F.2d at 1082. These requirements are not, however, interpreted strictly if the plaintiff can otherwise provide a basis for the inference that age was a factor in the employment decision.[2] See, Mitchell, 967 F.2d at 567 (citing Pace v. Southern Ry. System, 701 F.2d 1383, 1386-87 (11th Cir.), cert. denied 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983)).
 
 
 45
 We hold that Clark presented sufficient evidence of each element of the McDonnell Douglas scheme to establish a prima facie case. First, at the time Clark left Coats & Clark's employment he was 58 years old and therefore protected by ADEA. Second, Clark stated at his deposition that he was involuntarily retired because he refused to accept early retirement. Coats & Clark contends that Clark voluntarily accepted early retirement but concedes that Clark's statements create a factual issue precluding summary judgment on the issue whether Clark was subjected to an adverse employment decision. It therefore assumes, for purposes of summary judgment only, that Clark's statement that he was forced to retire is correct.
 
 
 46
 Third, Clark established that he was replaced by someone outside the protected age group. Although Coats & Clark attempts to cast Clark's termination as a part of a reduction in force, this characterization is contradicted by the record. As discussed above, the number of employees at the plant was increasing at the time Clark stopped working. More important, Bradner stated that Jim Cauthen, aged 27 at the time, took over Clark's position as department manager of preparation and spinning, Bradner Dep., at 83, and further stated that Cauthen actually had fewer responsibilities than Clark. See id. at 86. This evidence was sufficient to establish that Clark was replaced rather than reduced and that his replacement was outside the protected age group.
 
 
 47
 Fourth, Clark presented evidence sufficient to establish that he was qualified for the position of department manager of preparation and spinning. In Title VII and ADEA cases we have focused on plaintiffs' skills and background to determine if they were qualified for a particular position. See Smith v. Farah Mfg. Co., 650 F.2d 64, 68-69 (5th Cir. Unit A July 1981) (ADEA); see also Woody v. St. Clair Cty. Comm'n, 885 F.2d 1557, 1561-63 (11th Cir.1989) (Title VII); Wu v. Thomas, 847 F.2d 1480, 1484 (11th Cir.1988), cert. denied, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989); Panlilio v. Dallas Independent School Dist., 643 F.2d 315, 318 (5th Cir. Unit A Apr. 1981) (Title VII). Clark's 25 years of service in supervisory positions and the fact that Coats & Clark transferred him into the position of department manager of preparation and spinning from assistant plant manager--a job with even greater responsibility--both show that he possessed the skills and background necessary to be a department manager.
 
 
 48
 Coats & Clark introduced several reprimands issued to Clark regarding his handling of specific incidents. These reprimands may indicate that Coats & Clark was concerned about Clark's performance, but they do not establish that Clark was unqualified. In any event, concerns about Clark's performance are more appropriately raised as part of the second and third steps of the McDonnell Douglas scheme. See Young, 840 F.2d at 829 n. 3; Rosenfield, 827 F.2d at 1495 n. 2; see also Siegel v. Alpha Wire Corp., 894 F.2d 50, 54 (3d Cir.), cert. denied, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); Bienkowski v. American Airlines, Inc., 851 F.2d 1503, 1505-06 (5th Cir.1988).[3]
 
 
 49
 Because Clark has established a prima facie case Coats & Clark must articulate a legitimate nondiscriminatory reason for his involuntary retirement. Coats & Clark asserts that, if it did force Clark to retire, it did so because his performance was unsatisfactory. An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate nondiscriminatory reason for termination. See Young, 840 F.2d at 830. Coats & Clark thus has met its burden of articulating a nondiscriminatory reason for Clark's involuntary retirement, so to avoid summary judgment Clark must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination. Id. The burden of proving pretext merges with the plaintiff's ultimate burden of proving that age was a determining factor in his discharge, and it can be met by showing that a discriminatory reason more likely than not motivated the employer's decision, or by discrediting the employer's proffered explanation. See Elrod, 939 F.2d at 1470.
 
 
 50
 The evidence introduced by Clark could lead a reasonable juror to conclude that age more likely than not motivated the decision to force Clark to retire. According to Clark, he rejected the offer of early retirement but was forced to retire anyway. Although Coats & Clark contends that Clark voluntarily retired it admits that it offered Clark early retirement and further admits that its decision to offer Clark early retirement was based on age as well as performance. See Bradner Dep., at 83, 85. Moreover, when asked what impact Clark's performance had on the decision to offer early retirement, Bradner responded:
 
 
 51
 Well it played a part in it. As to how much I couldn't very well tell you that. But, it was part of the decision making process, along with the fact that he was eligible for early retirement.
 
 
 52
 Bradner Dep., at 87. Based on this response and Clark's statement that he was forced to retire, a rational juror could infer that age was a determinative factor in the decision to force Clark into retirement. See Young, 840 F.2d at 831 (noting that termination following offer of retirement may, in some cases, support inference of age discrimination). Furthermore, assuming that Clark's statement that he was forced to retire is true, Bradner's statement that Clark voluntarily retired is a serious misrepresentation. This misrepresentation, combined with the admission that Clark's age was a factor in the decision to offer early retirement, provides further support for the inference that age discrimination motivated Coats & Clark's decision to force Clark into retirement. See Shager v. Upjohn Co., 913 F.2d 398, 401 (7th Cir.1990).
 
 
 53
 The evidence concerning Clark's performance does not compel the conclusion that he was forced to retire based on performance. Coats & Clark contends that Clark was involuntarily retired after 25 years at the supervisory level because his autocratic management style could no longer be tolerated. In support of this contention, Coats & Clark introduced evidence that could lead a reasonable juror to conclude that Coats & Clark was concerned about Clark's managerial style.[4] But this evidence does not establish that Coats & Clark was so dissatisfied with Clark's performance that a reasonable juror would be precluded from finding that age was a determinative factor in the decision to involuntarily retire Clark. In short, whether Clark was discriminated against because of his age is a question that must be decided by a jury. Accordingly, we reverse the grant of summary judgment to Coats & Clark on Clark's ADEA claim.
 
 
 54
 C. Intentional Infliction of Emotional Distress
 
 
 55
 Clark also claims that, under Georgia law, his termination constituted the tort of intentional infliction of emotional distress. The district court held that this claim was precluded by the exclusive remedies provision of the Georgia Workers' Compensation Act, O.C.G.A. § 34-9-11, and, if the claim could be brought, that Coats & Clark's conduct was not extreme and outrageous. We agree that, under Georgia law, Coats & Clark's conduct was not extreme and outrageous and therefore do not address the issue whether Georgia's Workers Compensation Act provides the exclusive remedy.
 
 The Georgia Supreme Court has stated:
 
 56
 One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
 
 
 57
 Yarbray v. Southern Bell Tel. & Tel. Co., 261 Ga. 703, 409 S.E.2d 835, 837 (1991) (quoting Restatement (Second) of Torts § 46(1) (1965)). Whether conduct is sufficiently outrageous and egregious to support a claim is a question of law governed by an objective standard: the evidence must show that reasonable persons might find the presence of extreme and outrageous conduct. Id. 409 S.E.2d at 838. Conduct is not extreme and outrageous simply because it is unkind or causes someone's feelings to be hurt. Peoples v. Guthrie, 199 Ga.App. 119, 404 S.E.2d 442, 444, cert. denied, (Ga. May 15, 1991). Rather, the conduct must "be of such serious import as to naturally give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress." Id.
 
 
 58
 Applying this standard, Georgia courts have held that an employer's termination of an employee--however stressful to the employee--generally is not extreme and outrageous conduct. ITT Rayonier, Inc. v. McLaney, 204 Ga.App. 762, 420 S.E.2d 610, 612, cert. denied, (Ga. Sept. 11, 1992); Borden v. Johnson, 196 Ga.App. 288, 395 S.E.2d 628, 630, cert. denied, (Ga. Sept. 27, 1990); Lane v. K-Mart Corp., 190 Ga.App. 113, 378 S.E.2d 136, 138, cert. denied, (Ga.1989). Assuming that Clark's version of events is correct, he has not shown any circumstances that would warrant departure from the general rule. He was forced to retire but was not subjected to any abuse or otherwise treated with disrespect. Considering Clark's 38 years of employment with Coats & Clark the failure to provide Clark with any advance notice of his retirement or with a going away party may be harsh or unkind, but, under Georgia law, is not outrageous enough to support a claim of intentional infliction of emotional distress. Accordingly, the grant of summary judgment to Coats & Clark on Clark's intentional infliction of emotional distress claim is due to be affirmed.
 
 D. Reassignment
 
 59
 In Coats & Clark II the plaintiffs asked that, if a remand were ordered, we direct that the case be assigned to a different district judge. The request was denied because it was based upon an affidavit not part of the record. We recognized, however, that as part of our supervisory authority this court could order reassignment. See Coats & Clark II, at p. 609 n. 10; see also Offut v. U.S., 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954).
 
 
 60
 On remand the district court received supplemental briefs and thereafter granted summary judgment on each count against all plaintiffs. The judge's order contained strong language expressing dissatisfaction with this court's decision. Plaintiffs then filed a motion, based upon that language, asking that the judge be disqualified. This was denied both on the merits and because it was untimely. On appeal the plaintiffs assert that the denial was error.
 
 
 61
 We do not need to decide whether the court erred in denying the untimely motion for recusal. Instead we have reviewed the record in the light of elements set out by this circuit to be considered in determining whether to reassign a case to a different judge where there is no indication of actual bias. U.S. v. Torkington, 874 F.2d 1441, 1447 (11th Cir.1989). We conclude, from the face of the record that, in the language of Torkington, "the original judge would have difficulty putting his previous views and findings aside." We therefore direct that on remand the case be assigned to a different judge.
 
 V. CONCLUSION
 
 62
 We AFFIRM the grant of summary judgment on appellants' ERISA claims and Clark's intentional infliction of emotional distress claim. The grant of summary judgment on Clark's ADEA claim is REVERSED and the case is REMANDED to the district court for further proceedings not inconsistent with this opinion. The chief judge of the district court is DIRECTED to reassign this case to another judge.
 
 
 
 [1]
 Because the requirements of a prima facie case under McDonnell Douglas vary depending on factual circumstances and the type of claim asserted, this court has avoided overly strict formulations of the elements of a prima facie case. Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1500 (11th Cir.1991). The elements enunciated above therefore may not be appropriate for all § 510 claims
 
 
 [2]
 For example, in unlawful termination claims under the ADEA this court has permitted plaintiffs to establish a prima facie case by showing that:
 (1) [he] was within the protected group; (2) [he] was discharged; (3) [the employer] sought to replace him with a younger person; and (4) he was replaced with a younger person outside the protected group.
 Marshall v. Goodyear Tire & Rubber Co., 554 F.2d 730, 735-36 (5th Cir.1977); see also Rosenfield v. Wellington Leisure Prods., Inc., 827 F.2d 1493, 1495 (11th Cir.1987); Pace, 701 F.2d at 1386 n. 7. Although this formulation of the McDonnell Douglas scheme does not require an employee who has held a position for some time to prove qualification, the employee must show that the employer specifically sought to replace him with someone younger. Pace, 701 F.2d at 1386 & n. 7. Clark has not asserted that he satisfied this articulation of the McDonnell Douglas scheme.
 
 
 [3]
 Whether an employee possesses the qualifications for a position thus is generally distinct from the issue whether he performed the job satisfactorily. But this decision should not be read to hold that evidence of performance is never relevant at the prima facie stage. We have permitted plaintiffs alleging unlawful discharge to establish that they were qualified by introducing evidence that they had performed the job without complaint. See Elrod, 939 F.2d at 1470; Baker v. Sears, Roebuck & Co., 903 F.2d 1515, app. at 1518 (11th Cir.1990); Stanfield v. Answering Serv., Inc., 867 F.2d 1290, 1294 (11th Cir.1989). If the employee relies on satisfactory job performance to establish his qualifications, evidence of poor job performance may also be relevant at the prima facie stage
 
 
 [4]
 Coats & Clark's evidence consisted of performance reviews, memorandum documenting verbal warnings, and the affidavits of other employees. The three performance reviews submitted by Coats & Clark show that it twice rated Clark's overall performance as satisfactory and once as very good. The reviews all praise Clark's technical abilities but do indicate some concern that Clark's management style was too autocratic. Nevertheless, Clark never received less than a satisfactory rating in the Human Relations Category, and the last performance review states:
 Bill [Clark] has adjusted well with the change in management structure and is showing improvement in changing from his authoritative management style to a more participative management style.
 Clark Dep., exh. 1. The memoranda indicate that on seven different occasions Clark was given verbal reprimands, but Coats & Clark has not introduced evidence of any incident serious enough to warrant a written reprimand. Finally, Coats & Clark introduced the affidavits of four other workers, still employed by Coats & Clark, stating that Clark had been difficult to work with.