[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 31, 2005
THOMAS K. KAHN
CLERK

No. 05-10548
Non-Argument Calendar

_____

D. C. Docket No. 02-00609-CV-P-S

CAROLYN J. AMOS,
PEGGY A. SAUNDERS,
BRENDA GILBERT,

Plaintiffs-Appellants,

versus

TYSON FOODS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(October 31, 2005)

Before BIRCH, BLACK and PRYOR, Circuit Judges.

PER CURIAM:

Carolyn J. Amos, Peggy A. Saunders, and Brenda Gilbert are female and self-described "white American citizens," who appeal the district court's judgment against them as to their claims of retaliation and discrimination raised pursuant to Title VII of the Civil Rights Act of 1964. Although appellants argue that the court's order fails to address their claims, we disagree and find those claims to be without support in law or fact. We AFFIRM.

## I. BACKGROUND

Because employment discrimination cases are fact intensive, we include a detailed recitation of the facts in this background section. First, we provide an overview of the allegations. Second, because the case arises following summary judgment, we summarize the facts in a light most favorable to the appellants. Finally, we review the findings and order of the district court.

A. Overview

Amos and Saunders filed an action against Tyson, their employer, claiming that they were discriminated against based on (1) national origin, in violation of Title VII; (2) their age, in violation of the ADEA; (3) their gender, in violation of Title VII; and (5) their age, in violation of state law. The also claim that they were

2

retaliated against, in violation of Title VII.

At the time the claims were filed, Amos and Saunders worked in the sanitation department of Tyson's chicken processing plant in Blount County, Alabama, during the third shift, nightly from midnight to 8 A.M. Mary Miller, who worked on the floor in a position called the "lead", was immediately senior to Amos and Saunders. The Tyson hierarchy, as it relates to this case, began with Amos and Saunders's direct supervisor, Theresa Johnson. Johnson reported to Roni Noriega, who was the department superintendent. Two members of the plant's human resources department supervised the enforcement of Tyson's employment policies, as related to this case. Audrey Johnson was the second shift human resources manager, and Jan Casey was the employment supervisor.

Amos and Saunders filed an amended complaint that added Brenda Gilbert to the action. Gilbert asserted Title VII claims of (1) racial discrimination based on national origin and (2) retaliatory discharge. Gilbert settled lawsuits against Tyson for workers compensation, sexual harassment, and discrimination in 1999. She alleged that as a result of these suits, she was targeted for harassment and, ultimately, discharge.

Amos and Saunders argue that the district court erred in (1) finding that they did not establish a prima facie case of discrimination based on national origin;

3

and (2) finding that they did not show that Tyson's proffered reason for its action was a pretext for discrimination. Gilbert contends that the district court erred in finding that she did not produce evidence of a similarly situated employee who was not terminated or that the proffered reason for her termination was not a pretext for discrimination or retaliation.

B. Amos and Saunders's Claims

According to their complaint, Amos and Saunders were in the women's restroom at Tyson's Blount County facility when Roberto Maysonet, a Hispanic male employee, entered the restroom, walked between the two women, and exited a door on the other side. They claim that the light discipline received by Maysonet following the bathroom incident is evidence of disparate treatment of persons of different national origins. Amos and Saunders argue that they engaged in a protected activity when they reported the bathroom incident through internal grievance procedures; that they were subject to two separate disciplinary acts in retaliation for reporting the restroom incident; and that Maysonet was placed in their work area in retaliation. In addition to the bathroom incident, Amos and Saunders complain that their removal from the pipe crew, an overtime opportunity, was an adverse employment action and that the denial of new rain suits was

4

evidence of a pattern of national origin discrimination. The bathroom incident is discussed first, followed by Amos and Saunders's other grievances.

1. The Bathroom Incident

Amos stated in her deposition that Maysonet walked into the women's restroom while she and Saunders were changing in February 2001. Maysonet walked through the restroom, "in no hurry," was "gawking" at the two women, and stopped briefly inside. Saunders testified that Maysonet taunted her with hand motions. Amos indicated that this incident did not anger her, make her cry, or cause her to miss work.

Immediately after the incident, Amos and Saunders went straight to their supervisor's office to report it. They reported to Noriega, Miller, and Teresa Johnson that a man entered the women's restroom while they were inside it. Amos did not demand that Maysonet be terminated or seek any other disciplinary action.

Teresa Johnson acknowledged that Amos and Saunders said that a male employee walked in the restroom while they were in it and that someone needed to make sure people knew what their jobs were. Her understanding was that Amos and Saunders were upset because the man who intruded upon them did not know his job, not necessarily because he saw them undressed. She testified that she and

Noriega handled the situation and did not report the incident to human resources because they did not think it was a case of sexual harassment. During the meeting, Noriega said that Maysonet did not speak English and did not know any better.

Jan Casey learned about the restroom incident during unrelated investigations into Amos's behavior.[1] Casey determined that Amos told Teresa Johnson about the encounter in the restroom. Teresa Johnson was suspended for five days because she had knowledge of the incident but failed to report it to the human resources office.

Casey testified that Maysonet received a serious counseling statement as a result of the investigation into the restroom incident. Although Maysonet continued to work near Saunders and Amos, Casey did not receive any further complaints regarding Maysonet. When Amos and Saunders told Miller that they were uncomfortable working near Maysonet, he was moved away from the two women, although he remained within the sanitation department. Miller said that she did not believe that Amos and Saunders saw Maysonet again after this remedial measure was taken.

---

[1] Amos was informed that she was being placed on a three-day suspension "for calling a team member a 'bitch.'" R1-1 at 4. The next day, Audrey Johnson called Amos back to work and told her that an investigation found no evidence of her alleged misconduct. She then handed her a letter of reprimand concerning the incident and told her to destroy it. She was then handed a reprimand letter that stated that "she had been observed wetting a team members with a hose accidentally." Id. at 5.

## 2. Other Alleged Discrimination

Amos and Saunders claimed three other categories of incidents were evidence of discrimination based on national origin: (1) disparate treatment with regard to assigning overtime; (2) disparate treatment with regard to the distribution of rain suits; and (3) the fact that white employees had to pick up the slack for non-English speaking employees. Saunders also alleges that a fan and drain in her area were also not repaired out of retaliation for this suit.

Regarding the change in overtime availability, Tyson appears to have been advancing general cost cutting measures by assigning more tasks to workers during their regular shifts in order to reduce the need for overtime workers. Tyson explicitly instructed its managers to reduce overtime hours. This overall reduction in overtime affected more Hispanic workers than American ones, because 75 percent of the second shift workforce is Hispanic. However, at least one non-Hispanic worker continued to receive overtime.

Although Amos and Saunders allege that they were discriminated against in the distribution of new rain suits, their supervisor, Teresa Johnson, testified that she did not remember them complaining to her about not receiving rain suits. Amos and Saunders also complain that non-English speaking employees are not

selected for extra-duties; however, this issue is not pursued on appeal.[2]

C. <u>Gilbert's Claims</u>

Brenda Gilbert is also an employee at the Blount County Tyson Foods plant. She claims that Tyson selectively follows its workplace violence policy in a manner that retaliated against her for prior employment discrimination suits against the company and in a manner that discriminates based on national origin. Gilbert admits to the facts that led Tyson to end her employment, based on the work place violence policy, but argues that similar facts did not result in termination in other cases.

During a conversation with her supervisor regarding an extension to her vacation, Gilbert said she "would kill her roommate." R1-20 at 5. Her roommate was Chirell Jones, also a Tyson employee. Gilbert's supervisor, Tommie Harris, taking Gilbert's statement as a serious threat, replied, "[Y]ou can't do that," to which Gilbert said, "I'm not, I'm just mad, I want my stuff back." <u>Id.</u>

When Gilbert reported back to Tyson, she was told to proceed directly to the office and was accompanied by a security guard. At the office, Jan Casey and

---

[2] Issues not raised on appeal are considered abandoned. <u>Greenbriar, Ltd. v. City of Alabaster</u>, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

Audrey Johnson told her that she was being suspended for her threat to kill Jones. Gilbert was terminated on 3 April 2002, for violating Tyson's workplace violence policy.

Tyson terminates employees who violate the workplace violence policy. After receiving notice of the threat, Casey consulted with the corporate office. Casey interviewed Jones, who was concerned that Gilbert might kill her. Audrey Johnson spoke with Jones the night of the threat and found her to be upset.

Reviewing the history of the policy, Casey noted that Juan Vargas, a Hispanic male employee who threatened to kill a co-worker, was terminated. Another investigation, which involved Gilbert as the victim, revealed that a Hispanic male worker named "Torres" nudged or tapped Gilbert but that he did not forcefully strike her. Nonetheless, Torres was discharged for this conduct. Casey does not know of any employees who were disciplined but not terminated for violating this policy. Gilbert discusses two incidents that she claims prove otherwise.

First, Gilbert claimed that Lydia Wilson, a Hispanic employee, threatened another worker with a knife on the processing floor and that she heard from other workers that Wilson and the employee she threatened fought in the restroom later that day. Because the allegedly threatening behavior occurred in Spanish, Gilbert

9

did not understand what was being said. An investigation of these allegations revealed conflicting reports that precluded action under the workplace violence policy.

Second, Gilbert claimed that Jones attacked her and should have been disciplined under the workplace violence policy. She claimed that Joey Broom, a superintendent, witnessed the altercation and threatened to terminate one or both of them if it happened again. Broom says he never saw the women arguing at work and never counseled them for fighting. Casey stated that, during the course of her investigation, Broom admitted that he once separated Gilbert and Jones during an argument, but did not witness them resorting to violence. Although these reports disagree on some details, they agree that no violence occurred between the two women.

D. The District Court's Decision

The court granted Tyson's motion for summary judgment. Reviewing the bathroom incident, the court found that Amos and Saunders did not report the 16 February 2001 bathroom incident to human resources until their 14 March 2001 meeting with Jan Casey. The court treated the bathroom incident as a sexual harassment claim and found that Amos and Saunders (1) did not put forth

evidence of conduct that was physically menacing or demeaning; (2) did not put forth evidence that the conduct unreasonably interfered with their job performance; and (3) did not establish that the conduct was sufficiently severe as to be actionable. Further, the court found that Tyson took immediate and appropriate corrective action.

With regard to their disparate treatment and retaliation claims, the court found that neither Amos nor Saunders suffered any actionable adverse employment action. The court concluded that Amos and Saunders did not engage in a protected activity because they could not have believed that one incident of a male employee in a women's restroom would create a hostile work environment. Further, the district court concluded that they were unable to show retaliation because there was no causal connection between their report and some adverse action. It noted that Amos could not show any employer, who knew about her prior complaints, punished her, and Saunders could not point to anything that happened to her after the incident in the restroom. Additionally, Amos and Saunders did not show that the reasons Tyson proffered for their actions were a pretext for discrimination.

Regarding Gilbert's retaliation claim, the court found that Gilbert could not establish a causal connection between the alleged retaliatory acts and her

11

termination, as nearly four years passed between the protected activity and the adverse action. Further, the court determined that she had not shown similarly situated persons who were treated more favorably as (1) she did not report Jones's threat when it occurred, (2) there was no evidence that Torres made discrimination complaints, and he was discharged, and (3) Gilbert introduced no admissible evidence as to whether Wilson had ever threatened another coworker. Further, even if she could establish a prima facie case, she was unable to challenge Tyson's legitimate, nondiscriminatory reason for her discharge, as Gilbert admitted that she threatened to kill Jones.

## II. DISCUSSION

We review "a grant of summary judgment de novo, using the same legal standard as the district court." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1184 (11th Cir. 1997). Summary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (citing Federal Rule of Civil Procedure 56(c)). The evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the nonmoving party. Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). In order to defeat summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586, 106 S. Ct. at 1356. The nonmoving party must make a sufficient showing on each essential element of the case for which she has the burden of proof. Celotex, 477 U.S. at 323, 106 S. Ct. at 2552.

Further, issues not raised on appeal are deemed abandoned. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989). Amos and Saunders therefore retain only their claims for overtime based on national origin discrimination[3] and their claims of retaliation for reporting the bathroom incident. Gilbert challenges only the denial of her retaliation claim.[4]

A. Amos and Saunders's Claims

---

[3] From the outset, all of the disparate treatment claims presented may have failed to exhaust the administrative remedies provided by the EEOC. The first count of both the original and amended complaint alleges "racial discrimination based on national origin." Because the claims fail on the merits, we need not decide whether failure to allege discrimination based on race in the EEOC complaint would have required dismissal in the first instance for failure to exhaust administrative remedies. But see Sanchez v. Standard Brands, Inc., 431 F.2d 455, 462–64 (5th Cir. 1970).

[4] Amos, Saunders, and Gilbert argue that the district court did not address all of the claims they asserted in the order for summary judgment. We disagree with appellants that the court did not address their claims. However, we may still affirm that decision if summary judgment was appropriate. See Rowe, 139 F.3d at 1382 n.2.

## 1. Disparate Treatment

Amos and Saunders argue that the district court erred in granting Tyson's motion for summary judgment on their claims of national origin discrimination. They assert that Tyson discriminated against them as Americans by treating Hispanic employees more favorably when disbursing supplies, assigning jobs, and awarding overtime. Title VII states, in relevant part, that it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff may prove a claim of discrimination through (1) direct evidence, (2) circumstantial evidence, or (3) statistical proof. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

Because appellants rely on circumstantial evidence, we use the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981), for their national origin claims. See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (discussing an ADEA claim). Under the McDonnell Douglas/Burdine framework, the claimant must first show an inference of discriminatory intent, and thus carries the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at

14

802, 93 S. Ct. at 1824. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employment action. Id., 93 S. Ct. at 1824. If the defendant is able to meet its burden, the plaintiff must then show that the proffered reason is merely a pretext for discrimination. Burdine, 450 U.S. at 256, 101 S. Ct. 1095.

To succeed with their disparate treatment claim, appellants had to show that: (1) they were members of a protected class; (2) they were subjected to adverse job action; (3) they were qualified to do the job; and (4) they were treated less favorably than a similarly situated individual outside their protected class. See Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam).

Plaintiffs must establish that they suffered an adverse employment action. See Davis v. Town of Lake Park, 245 F.3d 1232, 1238 (11th Cir. 2001). However, not all conduct by an employer negatively affecting an employee constitutes an adverse employment action. Id. Instead, "an employee must show a serious and material change in the terms, conditions, or privileges of employment. . . . [T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. at 1239.

15

Once a prima facie case is established, the employer has an opportunity to articulate a legitimate, nondiscriminatory reason for the challenged employment action. Jackson v. Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005). To show the proffered reason was merely a pretext, plaintiffs must

> demonstrate that the proffered reason was not the true reason for the employment decision . . . [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Id. (quotations and citations omitted). "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). A reason is not "pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752 (1993) (emphasis removed).

Upon review of the record and consideration of the parties' briefs, we find no reversible error. Assuming that Amos and Saunders belong to the protected class of Americans, aspects of their claim fail to allege adverse employment action. Although there are no hard and fast rules regarding the maintenance of workplace conditions, Title VII does not provide a remedy for the "ordinary

16

tribulations of the workplace." See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000). Although it might be possible for some level of discrimination regarding working conditions to rise to an actionable level, the facts of this case—alleging plugged drains and the slow filling of requests for new rain suits—fall short of an adverse employment action.

Tyson's reductions in overtime, however, withheld a financial benefit from Amos and Saunders. Discriminatory alterations of financial benefits may qualify as adverse employment actions. See Bass v. Board of County Commr's, 256 F.3d 1095, 1118 (11th Cir. 2001). The evidence shows, however, that more Hispanic workers were affected by the cuts in overtime than American workers. Accordingly, Amos and Saunders cannot show similarly situated employees outside their protected class who were being treated differently from them.[5] Therefore, the claim for discriminatory awards of overtime fails the fourth prong of the Knight requirements.

Furthermore, Tyson's reason for altering the overtime schedule was to reduce costs. The evidence revealed that there was a general need to cut overtime throughout the plant driven by legitimate business reasons. This was

---

[5] In fact, the record shows that at least one member inside the class of non-Hispanics continued with overtime work, so there was not even discrimination against the purported class.

17

accomplished by assigning the tasks to workers during their regular shifts and using fewer overtime workers. This reason is both legitimate and nondiscriminatory with regard to national origin. Amos and Saunders have put forth no evidence to show the reason was false, let alone a pretext for discrimination.[6] Because Amos and Saunders have failed in their burden to establish a prima facie case and to rebut the reason offered by the company for its action, we agree that Amos and Saunders's claim must be denied.

### 2. Retaliation

Amos and Saunders next argue that the district court erred in granting Tyson's motion for summary judgment on their retaliation claim. They assert that Tyson, among other things, cut their overtime and caused illegitimate punitive reports to be filed in response to their reporting of Roberto Maysonet. We, however, find no error.

Title VII prohibits retaliation in the employment arena:

It shall be an unlawful employment practice for an employer to

_____

[6] Amos, Saunders, and Gilbert argue that the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S. Ct. 2148 (2003), precludes summary judgment because mixed motive cases necessarily involve jury questions. Because they have not alleged any fact that would entitle them to a mixed motive jury instruction, we find this contention without merit. See also Pulliam v. Tallapoosa County Jail, 185 F.3d 1182, 1186 (11th Cir. 1999) (observing that the defendant may choose not to make a mixed-motive defense).

18

> discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). To prevail on a claim of retaliation under Title VII, a plaintiff must establish three elements by a preponderance of the evidence: (1) that the plaintiff engaged in an activity protected under Title VII, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action. Gupta, 212 F.3d at 587.

Internal reporting procedures advanced in furtherance of the goals of Title VII are protected under the statute. See Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001). Reports, however, must involve a good faith belief of unlawful discrimination. See Tipton v. Canadian Imperial Bank of Commerce, 872 F.2 1491, 1494 (11th Cir. 1989). The test has both a subjective and objective component. Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1388 (11th Cir. 1998). Thus, although a plaintiff need not prove actual sexual harassment, "it must be close enough to support an objectively reasonable belief that [the complained of conduct is in fact sexual harassment.]" Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).

Here, on the other hand, Amos and Saunders initially reported the bathroom

incident because they were upset that Maysonet did not know his job, not because they were seen undressed. Amos and Saunders therefore lacked the subjective belief that they were sexually harassed. In addition, the district court found that Amos and Saunders could not have believed that the single instance of a male entering their changing room constituted sexual harassment. We agree that this single instance would not entitle Amos and Saunders to an objectively reasonable belief that they had been sexually harassed.

Furthermore, even if Amos and Saunders could show that the reduction in overtime was related to their reporting of Maysonet, they cannot establish that the reason proffered for the reduction in overtime—to reduce operating costs—was a pretext for discrimination, as discussed in the previous section. Because Amos and Saunders failed to introduce any evidence that the legitimate reason for cutting costs was a pretext for discrimination, they have failed in a burden necessary to defeat the motion for summary judgment. See Clark, 990 F.2d at 1228.

B. Gilbert's Discharge Claims

Gilbert argues that the district court erred in granting Tyson's motion for summary judgment on both her claims of discrimination and retaliation. Gilbert

asserts that Tyson terminated her out of retaliation for her prior suits against the company. Further, she claims that she was discriminated against because, though she had threatened to kill her roommate and fellow Tyson employee, Chirell Jones, other Hispanic employees had made similar threats and were not terminated.

### 1. Retaliatory Discharge

With regard to her retaliation claims, it is undisputed that Gilbert's suits against Tyson were protected activity under Title VII and that she suffered an adverse employment action when she was terminated. However, there must still be a causal connection between the adverse action and the protected expression. See Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1524 (11th Cir. 1991). The Supreme Court requires the temporal connection in such circumstances to be "very close." Clark County School Dist. v. Breeden, 532 U.S. 268, 273–74, 121 S. Ct. 1508, 1511 (2001) (per curiam) (concluding that twenty months was not connected); see also Wascura v. City of S. Miami, 257 F.3d 1238, 1248 (11th Cir. 2001) (rejecting a FMLA retaliation claim because three and a half months was too long to find a retaliatory connection). We agree that the 33 month lapse between Gilbert's first settlement and her termination suggests the two events are unrelated.

21

## 2. Discriminatory Discharge

To succeed with her discriminatory discharge claim, Gilbert had to show that: (1) she was a member of a protected class; (2) she was qualified for the job from which she was discharged; (3) she was discharged; and (4) she was treated less favorably than a similarly situated individual outside her protected class or her former position was filled by someone outside the class. Maynard v. Board of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam). "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishment imposed." Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (internal citation omitted). "In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second guessing employers' reasonable decisions." Id. at 1259 (internal quotation and citations omitted). Employees are not "similarly situated" if management is aware of one's improper conduct, but not aware of the others'

22

conduct.  See Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 658–59 (11th Cir. 1998) (an employee who may have broken a rule but was not caught was not similarly situated to one who had been caught); see also Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000) (per curiam) (an employee who admitted to improper conduct was not similarly situated to one who did not). Summary judgment is appropriate if the plaintiff fails to show the existence of a similarly situated employee, and no other evidence of discrimination is present. Holifield, 115 F.3d at 1562.

The undisputed evidence showed that Gilbert, claiming national origin discrimination based on her American national origin, was fired and was qualified for the position she held.  Gilbert, however, did not offer evidence that there were other Hispanic employees who had a similar history of threatening conduct, that was known to Tyson management, who were retained.  Casey discussed two instances—Vargas and Torres[7]—where the policy was implemented and the employees released.

Gilbert alleges two incidents to prove her case.  The first incident, where she was the victim, is inapposite, because—even if true—there would be no

---

[7] Torres was dismissed for workplace violence prior to the establishment of the current policy.

national origin discrimination because there is no evidence in the record that Jones is Hispanic. Further, whereas Jones's alleged violation of the policy was neither documented nor admitted, Gilbert's violation of the policy was documented, and Gilbert admitted to making the threatening statement. These two distinctions condemn Gilbert's use of Jones as a comparator. See Bogle, 162 F.3d at 658–59 (11th Cir. 1998); Abel, 210 F.3d at 1339.

Gilbert's second example is Lydia Wilson. The evidence of workplace violence by Wilson is limited to Gilbert's allegations, as none of the supervisors at Tyson admit knowledge of the incident. Gilbert, however, did not personally witness anything that substantiates her position, relying entirely on the statements of other workers.[8] Such testimony is insufficient as a matter of law to establish a comparator for purposes of analyzing a retaliation claim. See Bogle, 162 F.3d at 658–59 (rejecting plaintiff's "unverifiable, anecdotal testimony" about alleged comparators where "witnesses who testified regarding these other incidents had no personal knowledge"); Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996) (rejecting plaintiff's testimony "based on the statements of unknown

---

[8] Gilbert saw the first conversation, which took place on the line, but did not understand the Spanish spoken by Wilson. Gilbert merely heard about the subsequent events that allegedly occurred in the bathroom. No disciplinary record exists to supplement Gilbert's allegations, and Gilbert has not produced a coworker to corroborate her version of the events.

24

coworkers"). Furthermore, as Wilson was neither caught in nor admitted to any violation of the workplace violence policy, she cannot serve as a comparator for the reasons listed previously regarding Jones. See Bogle, 162 F.3d at 658–59; Abel, 210 F.3d at 1339.

Finally, if actions that would violate a company policy are not brought to the attention of the company, then that evidence would not be useful in proving whether the company unlawfully discriminated in the application of its policies. Because there is no admissible evidence that Tyson management knew of the Wilson incident, they did not have the opportunity to implement their policy. Gilbert alleges no situation where Tyson knew of a workplace policy violation and applied its policies in a discriminatory manner. As such, her claim for retaliatory discrimination must fail.

### 3. Nonretaliatory Rationale

Once a prima facie case is established, the defendant may proffer a legitimate, nonretaliatory reason for the challenged action and the plaintiffs must put forth evidence showing that the reason is only a pretext for retaliation as noted above. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the

employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030.

Tyson's proffered reason—that Gilbert had violated the workplace violence policy by threatening to kill Jones—is neutral as to national origin and Gilbert's prior litigation. Gilbert cannot rebut the proffered reason by simply quarreling with it.[9] Because Gilbert does not even address how the policy of dismissing employees who threaten violence is discriminatory, she has failed in her burden to rebut Tyson's nonretaliatory reason for firing her.

### III. CONCLUSION

Amos, Saunders, and Gilbert's employment discrimination claims are without merit, and Tyson's disciplinary policies and procedures were followed in a nondiscriminatory manner. The district court properly granted summary judgment in favor of Tyson Foods. Accordingly, we **AFFIRM**.

---

[9] Gilbert argues that Tyson cannot use its workplace violence policy against her because she was not physically at work when she made the threatening statement to a Tyson employee. It is not our place to second guess either the elements of Tyson's policy regarding workplace violence or when those elements are met. Gilbert does not contest the soundness of a policy against workplace violence, and, therefore, she has not met her burden of rebutting Tyson's legitimate action in implementation of the policy.

26