Dale **NELSON**, Plaintiff,

v.

**J.C. PENNEY COMPANY, INC.**, Defendant.

No. C 91–4108.

United States District Court,
N.D. Iowa,
Western Division.

April 26, 1994.

Emmanuel Bikakis, Sioux City, IA, James C. Zalewski, Lincoln, NE, for plaintiff.

Michael Sheehan & Kevin Connelly, Chicago, IL, Douglas L. Phillips, Sioux City, IA, for defendant.

## MEMORANDUM OPINION AND ORDER

DONALD E. O'BRIEN, Senior District Judge.

A trial was held in this matter. The first and second causes of action (whether Plaintiff was discharged based on unlawful age discrimination and whether Plaintiff was discharged unlawfully in retaliation for his filing of an age discrimination charge with the Iowa Civil Rights Commission) were tried to a jury. The third and fourth causes of action (whether the Plaintiff was discharged in violation of Section 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Section 1140, and whether the Plaintiff was discharged in violation of the Iowa Civil Rights Act (ICRA)) were tried to the Court. The jury returned its verdict, finding that Defendant willfully and unlawfully terminated Plaintiff because of Plaintiff's age, and in unlawful retaliation for his filing of a discrimination charge.

The Court now enters its findings of fact and conclusions of law regarding the third and the fourth causes of action, and what, if any, damages Plaintiff should receive. After careful consideration, the Court upholds the jury verdict (finding willful discharge in violation of the ADEA) and makes its own finding that Defendant J.C. Penney did not violate ERISA, nor did it violate the ICRA when it discharged the Plaintiff. Based upon the Jury's verdict, it is therefore ordered, adjudged, and decreed that Plaintiff have a front pay judgment against the Defendant in the amount of $569,503.20, less set-offs for both the Social Security disability payments Plaintiff has received from the date of his termination to the date of this Order and for the disability payments Plaintiff has received from the Defendant, plus interest as provided by law, and a back pay award of $703,064.50 with no pre-judgment interest, reasonable attorney fees and the costs of this action.

## A. FINDINGS OF FACT

1. Defendant hired Plaintiff on October 10, 1960. Over the years, Plaintiff worked for Defendant in a variety of managerial positions at several midwest J.C. Penney stores. During the 1960s, Plaintiff was disciplined once for personnel problems relating to his store management.

2. Plaintiff became the manager of Defendant's Sioux City store in 1983.

3. Between 1983 and 1988, Plaintiff consistently received favorable evaluations for his performance as Defendant's Sioux City store manager.

4. In April, 1988, Plaintiff's subordinates alerted Plaintiff's superiors that they were unhappy with Plaintiff's management style, particularly his employee relations. Defendant responded by sending Plaintiff's immediate supervisor, District Manager Ted Stewart, to Sioux City to discuss these personnel issues with Plaintiff. District Manager Stewart did not go into detail about the complaints lodged against Plaintiff, but urged Plaintiff to improve his employee relations and management style.

5. On December 13, 1988, Plaintiff met with District Manager Stewart and Regional Personnel Manager Jim Fike to discuss Plaintiff's management style and "people issues." Again, Plaintiff was not given specific information about the employee complaints lodged against him, but was urged to improve.

6. On December 21, 1988, Plaintiff was summoned by District Manager Stewart and Regional Personnel Manager Fike to Defendant's district offices in Schaumburg, Illinois, and was given an oral warning regarding his apparent failure to comply with the company's directives about improving his management style.

7. On February 9, 1989, Plaintiff mailed a letter to Defendant's Senior Regional Personnel Relations Attorney Alan Butler. In that letter, he denied any misconduct on his part.

8. On March 21, 1989, District Manager Stewart and Plaintiff had a "clear the air" meeting where they discussed issues relating to Defendant's December, 1988 disci-

plinary actions against Plaintiff as mentioned in paragraphs 5 and 6 above. As a result of that "clear the air" meeting, Defendant discharged a second-level manager at the Sioux City store, with whom Plaintiff had prior conflicts. That second-level manager was never replaced. During this time, Defendant suggested that Plaintiff attend management training courses to help him improve his managerial style, but Plaintiff declined to do so.

9. In June, 1989, Plaintiff was diagnosed with colon cancer and soon thereafter underwent surgery for that cancer. Plaintiff recuperated through August, 1989 without working, and received full pay while he recovered. Plaintiff's medical bills were paid by Defendant's health insurance plan.

10. During his recovery, Plaintiff kept District Manager Stewart apprised of his medical condition.

11. Plaintiff, on November 22, 1989, received a favorable performance evaluation and a salary increase. Plaintiff also received an "A" rating as a store manager which made him eligible for either a promotion or a transfer to a larger store. This meant that he was considered to be one of J.C. Penney's most qualified store managers.

12. Through the next several months, Plaintiff continued working, though he was still receiving treatment for his cancer surgery. On April 10, 1990, he received another salary increase and heard nothing about any personnel problems that he might have been having at the Sioux City store.

13. From May 30, 1990 through June 10, 1990, Plaintiff was hospitalized for the repair of five abdominal hernias, for gastrointestinal problems, and for complications arising from those surgeries. Plaintiff's medical bills were paid by the Defendant's health insurance carrier and Plaintiff continued to receive full pay while he recuperated.

14. During his recovery from the summer 1989 and 1990 surgeries, Plaintiff was never pressured to return to work. When he did return, he didn't ask for any accommodations (i.e. a light work load, etc.) to aid in his recovery, though he could work at his own pace since his schedule only required 40 hours of work per week, without specific hours.

15. Plaintiff returned to work full-time prior to the end of July, 1990.

16. In July and August, 1990, Defendant's corporate headquarters received two anonymous letters from Plaintiff's Sioux City subordinates—one dated July 10, 1990 and one dated July 29, 1990. These letters referred to low morale among employees in the Sioux City store and to other personnel-related issues which were blamed on Plaintiff.

17. As a result of those letters, Defendant's Senior Regional Personnel Relations Attorney Butler, along with District Personnel Manager Tom Wright, conducted a "personnel audit" at the Sioux City store on August 14 and 15, 1990. During the "audit," Plaintiff was asked to leave the store so that the employees could speak frankly and without fear of reprisal. Plaintiff was instructed not to interrogate any associates about what they said during the audit, nor to retaliate against anyone who might have met with Mr. Butler and Mr. Wright.

18. The personnel audit, although conducted as an "open forum" for discussions about *any* problems at the store, was really being held to determine whether the allegations in the anonymous letters were true, and to determine the actual severity of the allegations contained in those letters.

19. The audit was conducted as a one-on-one discussion between store employees and either Mr. Butler or Mr. Wright. Each man conducted audits of different departments. During these discussions, Wright and Butler asked general questions, such as: how are things going at this store? Do you have any concerns you would like to discuss?

20. In all, approximately 20 current employees were interviewed, as were five former employees. Seven of the 20 were current management employees. Each of the employees was told that if Plaintiff interrogated them, or in any way tried to find out from them what had been discussed at the

audit, they were to report this to the district manager at once.

21. As a result of these discussions, on August 31, 1990, District Manager Stewart and Regional Personnel Manager Fike administered a "written corrective interview" to Plaintiff. This type of interview is a disciplinary action, more severe than a verbal warning, and is generally considered to be one of the last steps that Defendant takes before terminating an employee.

22. At the "written corrective interview," Plaintiff received a proposed script. This script was Defendant's attempt at a speech to be read by Plaintiff to his subordinates, which outlined what their complaints were and which emphasized his willingness to make appropriate changes and to be more sensitive to their feelings. Plaintiff was told that if he wanted to remain in the Sioux City store, he would have to make a speech to his subordinates which contained the basic overall meaning and content of the proposed script. Plaintiff was also told that he was not to discuss the existence of the script with anyone, but that he could make pre-approved revisions to the script.

23. Plaintiff never raised his medical condition as an excuse or justification for his personnel problems, and Defendants never suggested that his medical condition had anything to do with their decision to have him read the speech.

24. After receiving the script and before making any changes to it, Plaintiff discussed its contents with two of his management associates—Dennis Bostow and Tom Chrystal. This conversation was directly contrary to the orders Plaintiff had been given by his superiors, Mr. Fike and Mr. Stewart. Plaintiff met with Mr. Bostow and Mr. Chrystal because during his medical absences those two men had been responsible for personnel matters at the Sioux City store, and he felt that they could enlighten him as to the personnel matters listed in the script. He also met with them to determine if the script accurately depicted other employees' perceptions of him. During the conversation, Plaintiff told Mr. Bostow and Mr. Chrystal that he did not believe the allegations contained in the prepared speech were true. After being asked by Plaintiff for his opinion, Mr. Chrystal advised Plaintiff not to read the script if Plaintiff did not believe that its contents were correct.

25. In accordance with the order he had received at the personnel audit, Mr. Bostow informed District Manager Stewart that Plaintiff had interrogated him about matters relating to the audit when Plaintiff discussed with him the proposed script.

26. After being contacted by Mr. Bostow, District Manager Stewart, accompanied by Regional Personnel Manager Fike, met with Plaintiff on September 12, 1990 and informed him that his discussion with Mr. Bostow and Mr. Chrystal was a breach of the order they had given him not to contact anyone concerning the "audit," and that because he had done so he had destroyed his chance to remain as the Sioux City store manager. They were especially upset that during his discussions with Mr. Bostow and Mr. Chrystal—two high level managers—he had intimated that the allegations contained in the proposed script were not accurate. Mr. Stewart and Mr. Bostow felt that such a contention destroyed any chance that a later speech made to the "management team" would be credible. Plaintiff was informed that the consequence of his discussing the speech was a reassignment to a smaller store.

27. On September 14, 1990, Plaintiff was informed that he had been transferred from Sioux City to Defendant's relatively smaller Bismarck, North Dakota store. However, Plaintiff's compensation was not lowered. He was informed that his annual salary would remain at approximately $92,270.

28. On October 1, 1990, Plaintiff reported to work at the Bismarck store. On October 2, 1990, Plaintiff met with District Manager John Henderson, who gave Plaintiff an orientation tour of the store. During the tour, District Manager Henderson informed Plaintiff that he was aware of Plaintiff's past problems in Sioux City, but he assured Plaintiff that he would be given a "clean slate" in Bismarck. At trial, District Manager Henderson testified that he

did not mean to suggest that Plaintiff's problems in Sioux City would be erased from his employment files, but that by telling Plaintiff he would be given a clean slate, Henderson meant to encourage Plaintiff to try his best to work cooperatively and constructively with his new subordinates, and to make Plaintiff feel welcome.

29. Plaintiff had a different interpretation of what was meant by "clean slate." He thought that his prior problems in Sioux City would be erased from his employment files, and that those problems would have no bearing on any decisions relating to his employment with Defendant from that day forward.

30. On December 21, 1990 an anonymous letter critical of Plaintiff's management style at Bismarck was received by District Manager Henderson.

31. On January 9, 1991, District Manager Henderson came to Bismarck to meet with Plaintiff regarding that letter. Although Plaintiff felt that he could refute the allegations of that letter, Mr. Henderson did not give Plaintiff a chance to respond. Mr. Henderson left Bismarck without telling the Plaintiff how he would deal with the situation.

32. On January 17, 1991, Plaintiff filed a charge of age and disability discrimination with the Iowa Civil Rights Commission against Defendant, alleging that Defendant's treatment of him during his tenure as Sioux City store manager amounted to unlawful discrimination against him.

33. On January 18, 1991, Plaintiff met with District Manager Henderson in Minneapolis, MN. At that meeting, Plaintiff was given a "final corrective interview," which is the most severe disciplinary action the company gives prior to termination. During the interview, Plaintiff was told that the anonymous letter received by Mr. Henderson contained the same types of allegations as those which led to his transfer from Sioux City, and that if Defendant received further, similar complaints, Plaintiff would be terminated. Plaintiff was not given a chance to explain his side of the story at this meeting, nor was he given an opportunity to refute the allegations in the letter.

34. During that January 18, 1991 meeting in Minneapolis, Plaintiff informed District Manager Henderson that he had previously filed a charge of discrimination against Defendant in Iowa. Plaintiff never used his medical condition as an excuse or justification for any of the allegations contained in the anonymous letter.

35. On January 18, 1991, Defendant explained to Plaintiff its newly-enacted management incentive pay plan which included a stock option plan whereby store managers could purchase stock at a fixed option rate which could be exercised for several years.

36. By late January, 1991, Defendant began compiling information in order to address the Iowa Civil Rights Commission's inquiries about Plaintiff's discrimination charge. One portion of the required information was a personnel file which was kept in Plaintiff's locked desk in his Bismarck office.

37. On February 1, 1991, on a day when the Plaintiff was not working, Regional Personnel Attorney Alan Butler ordered that a Bismarck J.C. Penney employee break open Plaintiff's desk and retrieve the personnel file.

38. On February 4, 1991, Plaintiff held a meeting with the store's managers at which he outlined their annual Management By Objective (or "MBO") goals.

39. On February 8, 1991, District Manager Henderson received another letter from Bismarck store employees complaining about Plaintiff's management style. This letter, dated February 6, 1991, (Exhibit M–1) was signed by each of the Bismarck store's department managers.

40. On February 15, 1991, District Manager Henderson and Regional Personnel Manager Fike terminated Plaintiff. After they announced that he would be terminated, they began to read the February 6 complaint letter to him, but he left the office before the reading could be completed. At no time prior to the announcement of his termination was Plaintiff ever given an

opportunity to defend himself against the allegations in the February 6 letter.

41. During that meeting, Plaintiff never suggested that his medical condition may have affected his job performance. At the same time, District Manager Henderson and Regional Personnel Manager Fike never suggested that their decision to terminate him had anything to do with his medical condition.

42. At the time of his termination, Plaintiff's cancer treatment was completed. No further surgeries were scheduled.

43. The jury verdict in this case indicated that Plaintiff's age was a determining factor in Defendant's decision to discharge Plaintiff. The jury concluded, as well, that Plaintiff's filing of a charge of discrimination with the Iowa Civil Rights Commission was a determining factor in the termination decision. Moreover, the verdict made clear that the jury believed that Defendant's actions against Plaintiff were willful.

44. Plaintiff, while employed by Defendant, participated in several ERISA-covered plans: a pension plan; a medical/dental insurance plan; a "savings, profit sharing and stock purchase" plan; a long-term disability insurance plan; and a life insurance plan.

45. After termination, Plaintiff remained vested in the Defendant's pension plan. He receives slightly in excess of $1,000 per month from that plan and will continue to receive that payment as long as either he or his wife is alive.

46. Termination did not affect Plaintiff's medical or dental insurance coverage, though he pays a slightly higher fee for the services. For insurance purposes, he is not treated as a terminated employee. He is treated as a retired employee, paying about $8 per month more than active employees.

47. Termination did not affect Plaintiff's interest in the savings plan. He remains vested. Although he is not eligible for future participation in the plan, the amounts which he added to it remain his.

48. Because the Social Security Administration determined that Plaintiff has been "disabled" since his last day of employment with Defendant, Plaintiff is receiving long-term disability from Defendant's plan and will continue to receive it so long as he is eligible. This is true, despite the fact that former employees of Defendant are not entitled to long-term disability insurance benefits.

49. Termination did not affect Plaintiff's eligibility for life insurance benefits. Again, he is being treated as a "retiree" for life insurance purposes. And, like a "retiree," he receives less life insurance coverage than an active employee. He has not needed to spend any money purchasing substitute coverage on the open market.

50. Plaintiff is also considered a "retiree" for purposes of receiving a J.C. Penney Employee Discount on items he purchases from any of the Defendant's stores.

51. After termination, Plaintiff made no realistic attempt to obtain alternative employment. His only act in that regard was to fill out an application with the Job Services Corporation of Iowa. He never applied to work for any of the Defendant's competitors. However, given his age and his medical condition, he was and is not likely to find comparable employment at a comparable wage with comparable benefits, and he has, therefore, done as much as can be expected to mitigate his damages.

52. As mentioned, after Plaintiff was terminated, he applied to the Social Security Administration (SSA) for disability benefits. After reviewing Plaintiff's application, the SSA determined that Plaintiff was totally disabled as of his last day of his employment with Defendant. In making its determination that Plaintiff was totally disabled, the SSA relied on assertions to that effect made by Plaintiff and others speaking on Plaintiff's behalf.

## B. CONCLUSIONS OF LAW

### 1. Plaintiff's ERISA discrimination claim (Third Cause of Action)

It is uncontested and this Court is persuaded that Defendant, J.C. Penney Company, was an "employer" under ERISA, that Defendant offered to its employees an

ERISA "employee benefit plan," and that Plaintiff, Dale Nelson, was an ERISA employee.

■ Under Section 510 of ERISA, 29 U.S.C. Section 1140, it is unlawful "for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or *for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan* . . ." (emphasis added). Unlawful ERISA discrimination is shown either by direct proof (*see Carter v. City of Miami,* 870 F.2d 578 (11th Cir.1989)) or by showing a scheme of discrimination through the use of circumstantial evidence as established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and restated in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

■ Evidence is direct when it is sufficient to prove discrimination without inference or presumption. *Carter,* 870 F.2d, at 581–82. Throughout the trial in the case at bar, Plaintiff conceded that he had no direct evidence of discrimination. Therefore, ·this Court must determine whether circumstantial evidence presented at trial established discrimination by the Defendant against the Plaintiff, in violation of ERISA.

■ Under *McDonnell Douglas,* in order to show circumstantial evidence of unlawful ERISA discrimination, the Plaintiff must first demonstrate by the preponderance of the evidence a *prima facie* case of discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093. *See also, Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1223 (11th Cir. 1993). In the context of an ERISA Section 510 claim (a claim that there was a violation of 29 U.S.C. Section 1140) alleging unlawful discharge, a plaintiff makes a *prima facie* case of discrimination by showing that he (1) is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. *Clark,* 990 F.2d, at 1223, *quoting Turner v. Schering–Plough Corp.,* 901 F.2d 335, 347 (3d Cir. 1990).

■ An employee is entitled to ERISA's protection when he is a participant in a plan covered by ERISA. Since the Court has already concluded that the Defendant's plan was covered by ERISA and that the Plaintiff was an employee of the Defendant's who participated in that plan, the Court is persuaded that the first *Clark* prong was met. Regarding the second prong of the *Clark* analysis, the Court concludes that the Defendant was qualified for the position he held prior to his termination. Even though he was sick and ornery, he knew how to run a store and had done so well for years. The Court notes, particularly, that Defendant consistently gave the Plaintiff nearly perfect ratings regarding his performance as a manager, particularly in the areas of store productivity and reduction of "shrinkage." The Court also notes that these same ratings were given to Plaintiff prior to or contemporaneous with the complaint letters received by Defendant's upper-management.

■ In regard to the third *Clark* prong, whether or not Plaintiff was discharged under circumstances that give rise to an inference of discrimination, this element can only be satisfied in favor of Plaintiff if he introduced evidence that would lead the Court to conclude that interference with ERISA rights was a motivating factor in his termination. *Turner,* 901 F.2d, at 348. Such a showing requires more than merely introducing evidence that, as a result of the termination, Plaintiff was deprived of the opportunity to accrue more benefits. *Clark,* 990 F.2d, at 1224 (*quoting Clark v. Resistoflex Co.,* 854 F.2d 762, 771 (5th Cir.1988)). Instead, an employee (Plaintiff) must show that his termination resulted in a substantial savings to Defendant in terms of benefit expenses. *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1115 (2d Cir.1988). This was not shown.

■ Because some loss of benefits is an inevitable consequence of nearly every employment termination, an essential element in an ERISA Section 510 case is "to show that

an employer was at least in part motivated by the specific intent to engage in activity prohibited" by the statute. *Dister*, 859 F.2d, at 1111. "No ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y.1982). Hence, a critical issue regarding Plaintiff's ERISA claim is whether Plaintiff has demonstrated that Defendant terminated him with the specific intention of depriving him of his ERISA benefits.

■ On page 7, paragraph 27 of his proposed findings of fact and conclusions of law, Plaintiff makes the blanket statement that his "eligibility and entitlement to benefits under an employee welfare benefit plan was . . . a determining factor in defendant's decision to discharge plaintiff." For support, on the top of page 12 of his proposal, the Plaintiff states that Defendant

> unlawfully discharged Nelson in violation of ERISA since it discharged Nelson in order to save medical costs on the health and welfare benefit plan, and also to save costs on Nelson's pension plan, in light of the fact that he was a thirty-year employee, and the new management incentive plan stood to greatly increase the pension benefits a senior manager like Nelson would accrue.

The Court finds no substantial support in the record for this assertion. The Court acknowledges that the Defendant introduced its new management incentive plan on January 18, 1991—less than a month before terminating the Plaintiff on February 15, 1991. However, the proximity between the introduction of the plan and the Plaintiff's termination is not enough to carry the ERISA claim.

The problem in this case is that Plaintiff failed to produce any substantial evidence which showed that Defendant intended to deprive him of his ERISA benefits. In fact, Plaintiff is still vested in his ERISA-covered plans and he continues to receive the same benefits as those received by active employees. Nothing has changed. The plan paid for Plaintiff's insurance benefits before his

discharge and it continues to pay those benefits today. The contention that the Plaintiff lost stock options is not accurate. Such options are a component of Plaintiff's compensation, but are not part of an ERISA plan. *See*, 29 C.F.R. Sections 2510.3–2(c) and 2510.3–1(b). Similarly, Plaintiff's references to other potential increases in compensation via salary and/or bonus (which Defendant refers to as "incentive") compensation, likewise is *not* an ERISA plan, but a payroll practice. *Id.* It is true that if the discharge was upheld, the Plaintiff would lose pension benefits resulting from the lost opportunity to accrue a few additional years of service. The Plaintiff's evidence in this regard was not persuasive enough to carry the day.

Based on the foregoing, the Court is persuaded that Plaintiff has failed to meet the third *Clark* prong. The Court is therefore persuaded that Plaintiff has failed to establish a *prima facie* case of ERISA discrimination. The Plaintiff's ERISA claim, therefore, is denied.

■ Moreover, before filing suit under the ERISA statute, employees are to first exhaust any internal administrative remedies under the plan. *Anderson v. Alpha Portland Industries*, 727 F.2d 177, 180 (8th Cir.1984). Plaintiff did not exhaust—nor does he assert that he even tried to exhaust—the administrative remedies under ERISA. Therefore, Plaintiff's ERISA claim is barred.

### 2. Plaintiff's Iowa Civil Rights Act (ICRA) Disability Discrimination Claim (Fourth Cause of Action)

It is not contested and this Court is persuaded that the Defendant is an "employer" within the meaning of Iowa Code Section 216.2(7), and that Plaintiff was an employee of Defendant's at all times relevant to this action.

■ Under Iowa Code Section 216.6(1)(a), it is an unfair employment practice for an employer to discharge any employee on the basis of a disability. Under Iowa Code Section 216.2(5), a "disability" is defined, in relevant part, as "the physical or mental condition of a person which constitutes a substan-

tial handicap." The terms "physical and mental condition" and "substantial handicap" are not defined in the Act. However, under *Sommers v. Iowa Civil Rights Comm'n*, 337 N.W.2d 470, 476–77 (Iowa 1983), a physical or mental impairment is a substantial handicap if it has "an inherent propensity to limit (one or more of the individual's) major life activities."

■ Therefore, the Court is confronted with two issues: whether the Plaintiff was "disabled" and, if so, whether the Defendant discriminated against the Plaintiff because of that disability. In making a legal determination on the issue of disability, the Court is mindful of the fact that Plaintiff underwent five surgeries during his final years as a manager for the Defendant's Sioux City and Bismarck, N.D. stores. Based on Plaintiff's testimony at trial, although he was given paid recuperation time and was not pressured to return to work at any time, he was nonetheless in great pain when working, and was not as objective or patient with others as he apparently was prior to those surgeries.

In addition, the Social Security Administration determined that Plaintiff is totally disabled and has been so-disabled since the day he was terminated by the Defendant. In light of the fact that Plaintiff was working under the residual effects of several surgeries and surgery-related complications which befell him in a relatively short span of time, as well as the Social Security Administration's total disability determination, this Court is persuaded that Plaintiff has made out a *prima facie* case of disability for the period relevant to this dispute.

■ The second part of the analysis is whether the Plaintiff was discriminated against by the Defendant on the basis of that disability. Under Iowa law, in order for an employee to establish a claim of disability discrimination, he must establish the following *prima facie* elements:

a. that he was disabled;

b. that he was qualified for the job from which he was discharged;

c. that despite his qualifications, he was terminated; and

d. that after his termination, the employer hired a person not in the employee's protected class, or retained persons with comparable or lesser qualifications.

*Trobaugh v. Hy–Vee Stores, Inc.*, 392 N.W.2d 154, 156 (Iowa 1986). *See also, McDonnell Douglas*, 411 U.S., at 802, 93 S.Ct., at 1824 (1972).

As mentioned above, the Court is persuaded that Plaintiff has shown that he was both disabled and qualified. Therefore, Plaintiff has established the first two *Trobaugh/McDonnell Douglas* factors[1].

■ In regard to the third *Trobaugh* factor, this Court is persuaded that despite his qualifications as a J.C. Penney manager, Plaintiff was discharged. As stated earlier in this Order, the Court is particularly persuaded by the fact that throughout his career and up to and contemporaneous with the complaint letters received by his subordinates, Plaintiff consistently received nearly perfect ratings from the Defendant regarding his performance as a manager.

The testimony of the Plaintiff and the Defendant's district-level management indicated that these ratings primarily emphasized areas such as store productivity and reduction of "shrinkage" (theft), and de-emphasized a manager's "people skills." Nonetheless, the

---

1. The Jury in this case did not actually make a finding of age discrimination on the basis of each individual *Trobaugh/McDonnell Douglas* factor. Instead, the Jury followed Final Jury Instruction No. 9, which was a modified version of Eighth Circuit Model Civil Jury Instruction 5.91 which stated that

> Your verdict must be for plaintiff on plaintiff's age discrimination or retaliation claim if he has proved by the preponderance of the evidence that plaintiff's age or filing of a charge

of discrimination was a determining factor in defendant's decision.

The Committee Comments to Instruction 5.91 state that "It is unnecessary and inadvisable to instruct the jury regarding the three-step analysis of *McDonnell Douglas* [citations omitted]. Instead, the submission to the jury should focus on the ultimate issue of whether intentional discrimination was a determining factor in the defendant's employment decision." This Court therefore assumes that the Jury ruled favorably on these two factors.

Defendant's representatives testified that promotions to larger stores and increases in pay were based in large part on those ratings reports.

The Plaintiff's ratings did not decrease until he was moved to Bismarck, and this rating reduction had more to do with his status as a "new" store manager than his ability to manage a J.C. Penney store [2]. Hence, the Court is persuaded that by issuing high ratings along with corresponding incentive pay raises to the Plaintiff, the Defendant conceded that Plaintiff was not only qualified to do the job, but was an outstanding store manager in spite of some perceived deficiencies in his ability to get along with his subordinates. The Court is accordingly persuaded that Plaintiff was terminated despite his qualifications as a store manager.

■ Regarding the fourth *Trobaugh* factor, whether Plaintiff was replaced by members of his protected class or whether Plaintiff was replaced by individuals of lesser experience or competence, this factor was not addressed by either party during the trial. Hence, the Court cannot decide, as a matter of law, whether Plaintiff's replacements were either disabled or less competent or experienced. Although some evidence suggested that the Bismarck, N.D. replacement was in his early 40s when Plaintiff was terminated, no evidence was presented concerning that individual's physical condition, experience or competence. Similarly, no evidence was offered in regard to the Sioux City replacement's physical condition, age, experience or competence. The Court cannot rule as a matter of law that the Defendant replaced the Plaintiff with individuals who were either not disabled or who were less qualified than the Plaintiff.

Therefore, the Court is persuaded that the Plaintiff did not make out a *prima facie* case of disability discrimination under the ICRA since he cannot establish all four of the elements required by *Trobaugh*. As a result, as to this disability discrimination claim, the Court finds for the Defendant.

*3. Plaintiff's Damages*

Mindful of the Jury verdict, which it upholds, the Court is persuaded that the Plaintiff is entitled to damages, costs and attorney's fees on his claim of age discrimination.

■ Since the Jury found that unlawful age discrimination occurred in this case, the Court's job is to fashion a remedy that will make the Plaintiff "whole" for injuries he has suffered due to this unlawful discrimination. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975); *Geller v. Markham,* 635 F.2d 1027, 1036 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981); *Dickerson v. Deluxe Check Printers, Inc.,* 703 F.2d 276, 279–80 (8th Cir.1983).

*a. Liquidated damages*

"Section 7(b) of the ADEA, 29 U.S.C. Sec. 626(b), provides for liquidated damages where a finding of willful violation is made." *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1561 (11th Cir.1988). Because the jury found that Defendant willfully violated the Age Discrimination in Employment Act, the Court will determine the amount of liquidated damages to be awarded to Plaintiff. "Liquidated damages" are defined in the Fair Labor Standards Act, 29 U.S.C. Section 216(b), incorporated by reference in the ADEA, 29 U.S.C. Section 626(b), as an amount equal to 'minimum unpaid wages or . . . unpaid overtime compensation.' " *Bruno v. W.B. Saunders Co.,* 882 F.2d 760, 772 (3d Cir.1989).

■ Liquidated damages are not permissible to double front-pay, though they are permissible to double back pay. *Bruno,* 882 F.2d, at 771–72. The standard for awarding liquidated damages in an amount which would double a Plaintiff's back pay award is whether "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines, Inc. v. Thurston,* 469

---

**2.** Testimony at trial indicated that when a manager is "reassigned," irrespective of whether it is the result of a promotion to a larger store or a demotion to a smaller store, a consequence is that the manager's rating is lowered because it is not possible to rate the manager's performance at that store until he has had the opportunity to manage it.

U.S. 111, 128, 105 S.Ct. 613, 625, 83 L.Ed.2d 523 (1985). The jury in this case was so-instructed in Jury Instruction # 9A, which states the following:

If you find that the defendant discriminated against the plaintiff on the basis of age or retaliated against him for filing a civil rights complaint, then you should further decide whether defendant's violation of the age discrimination statute was willful. If you find that defendant's violation of the ADEA was willful, the court will award plaintiff additional money damages.

A violation is willful if the defendant either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the federal law under which the plaintiff sues. A violation is willful if it is done deliberately and intentionally and not by accident, inadvertence or ordinary negligence.

Since willful discrimination is seldom admitted, you may consider any statements made, any acts done or omitted and all of the facts or circumstances disclosed by the evidence to show whether defendant willfully violated the Age Discrimination in Employment Act.

As can be seen in paragraph one, the Court told the Jury that if the violation was willful, the Court "*will*" award the Plaintiff additional money. The Jury Question relating to this was as follows:

3. Was the violation or violations willful as explained in Instruction No. 9A?

Yes **X**

No ___

■ The Jurors put an "X" on the "Yes" side. This Court is persuaded that it can under some circumstances deny the request to double the back pay award[3], but doesn't find any mitigating reason to do so.

The will of the Jury will not be disturbed. The award of back pay will be doubled.

*b. Front pay*

■ Plaintiff's Exhibit 27 is a calculation of benefits prepared by Plaintiff's expert Randall Kramer which includes liquidated damages. Mr. Kramer's benefits calculation is based on the assumption that, had he not been terminated, Plaintiff would have worked to age 65. The evidence showed that most J.C. Penney managers stopped working at age 60. This was because their benefits were tailored to maximize at that age. Defendant could not under the law force its managers out at age 60. The Plaintiff said that he intended to continue working beyond age 60. This Court cannot conclude that he would have quit at age 60. However, based upon the health of the Plaintiff and the fact that Defendant's retirement plan is geared to award the greatest benefits at age 60, and for those benefits to decrease thereafter, the Court is persuaded that the Plaintiff would have retired at age 63.

Plaintiff's Exhibit 1 is the J.C. Penney Benefits Statement for 1990. It indicates that retirement at age 60 would result in Plaintiff's target income from all sources being 52.1% of average earnings, in addition to the value of personal accounts and savings plans. It is reasonable to conclude that, working until age 63, Plaintiff would expect to retire at 53.5% of his average earnings.

■ Since Plaintiff obtained a jury verdict on his age discrimination and retaliation claims, he is entitled to front pay to the age of 63, computed in accordance with calculations set forth in Plaintiff's Exhibit 27. *Doyne v. Union Electric,* 953 F.2d 447, 450 (8th Cir.1992); *Acrey v. American Sheep Ind. Ass'n,* 981 F.2d 1569, 1576 (10th Cir. 1992). Front pay is especially appropriate

---

**3.** The district court's discretion in deciding whether to award liquidated damages is limited to situations in which the employer "can show good faith and reasonable grounds for believing it was not in violation of the ... ADEA." *Trans World Airlines,* 469 U.S., at 128, n. 22, 105 S.Ct., at 625, n. 22. *See also, Berndt v. Kaiser–Aluminum & Chemical Sales, Inc.,* 604 F.Supp. 962, 967 (E.D.Pa.1985) (Liquidated damages doubling back pay inappropriate where evidence insuffi-

cient to demonstrate defendant's knowledge that it was violating the federal law, or that it intended to do so, or that it operated under reckless disregard for the federal law); *Heiar v. Crawford Cty, Wis.,* 746 F.2d 1190, 1201 (7th Cir.1984) (Liquidated damages which would double back pay inappropriate where the defendant county could not be expected to know that it was violating the ADEA given confusion in the circuits as to whether the ADEA was unconstitutional).

where the Plaintiff has no reasonable prospect of obtaining comparable employment. *Buckley v. Reynolds Metals, Co.*, 690 F.Supp. 211, 214–15 (S.D.N.Y.1988); *Proctor v. Consolidated Freightways Corp.*, 1991 WL 170024 1991 U.S.App. LEXIS 3090 (9th Cir. 1991). As discussed more fully in subsection "d" of this Order, the Court is persuaded that at the time he was terminated, Plaintiff had no reasonable prospect of obtaining comparable employment. Therefore, front pay is appropriate in this case.

The Plaintiff's birthday was January 14, 1936. He was age 55 when he was terminated in February, 1991. Hence, he will turn 63 in 1999. Lines 5 through 9 on Exhibit 27 represent Plaintiff's salary plus stock options, multiplied by the 10 year treasury note rate of six percent annually from August, 1994 through August, 1999. One quarter of line four reflects one-quarter of the salary plus stock options which will commence on August 1, 1994, four and a half months from the date of this Order. This is front-pay. The other three quarters of line 4 is back pay from August 1, 1993 to the date of this Order. Thus, the calculation from Exhibit 27 is as follows:

| Exhibit 27 Present Value Totals: | | |
|---|---|---|
| Line 5: | 8/1/95 | $109,574 |
| Line 6: | 8/1/96 | $109,623 |
| Line 7: | 8/1/97 | $109,561 |
| Line 8: | 8/1/98 | $109,536 |
| Line 9: | 8/1/99 | $109,580 |
| Total of Lines 5 through 9: | | $547,874.00 |
| | | + |
| One quarter of Line 4 of Exhibit 27: | | $27,381.75 |
| ($109,527 ÷ 4 = 27,381.75) | | |
| Gross Front Pay Award: | | $575,255.75 |

Thus, Plaintiff's gross front-pay award is $575,255.75. Based upon the cross-examination testimony of Mr. Kramer regarding the levelling off of annual salary increases for J.C. Penney managers as they reached a certain salary threshold, the Court is persuaded that this gross pay figure should be reduced by 1%, or $5,752.55. Therefore, the Court finds that Plaintiff is entitled to a net front-pay award of $569,503.20.

### c. Back pay

Similarly, the first four lines of Plaintiff's Exhibit 27 represent the annual pay Plaintiff would have received—plus eight months' pay—had he not been terminated by Defendant. This is commonly referred to as "back pay." Dating back from the date of this Order, the total back pay to be awarded Plaintiff, minus the extra four months' pay from April, 1994 to August, 1994, is as follows:

| Exhibit 21 Present Values: | | |
|---|---|---|
| Line 1: | 8/1/91 | $ 50,241 |
| Line 2: | 8/1/92 | $109,573 |
| Line 3: | 8/1/93 | $109,573 |
| Total of Lines 1 through 3: | | $269,387 |
| | | + |
| Three Quarters of Line 4 from Exhibit 27: | | $ 82,145.25 |
| ($109,527 ÷ .75 = $82,145.25) | | |
| Back Pay Award: | | $351,532.25 |
| | × | 2.00 |
| Total Back Pay Award: | | $703,064.50 |

### d. Mitigation of damages

In order to minimize damages owed to unlawfully-terminated employees, the employer has the burden of proof to show that the plaintiff employee failed to exercise reasonable diligence in seeking other employment in an attempt at mitigating his damages. *Spulak v. K–Mart Corp.*, 894 F.2d 1150, 1158 (10th Cir.1990). As stated above, the Court is persuaded that Plaintiff did what he could to mitigate his damages. It is true that the Plaintiff did not go out and get a job selling cars. However, this Court is persuaded that a 30–year manager for a national department store chain should not have to go out and sell cars or pursue any other significantly lower-paying career for which he is not qualified in order to mitigate damages. The Court is persuaded that at age 55 Plaintiff had no chance of becoming a manager for a J.C. Penney competitor such as Sears or Montgomery Ward for the same or similar wages. Therefore, the Court is persuaded that Defendant did not meet its burden of showing that Plaintiff failed to mitigate his damages. *Buckley*, 690 F.Supp., at 214.

The evidence at trial indicated that Plaintiff enjoys the benefit of the Defendant's associate discount privilege, which should continue. Term life insurance benefits have been restored to Plaintiff since he has been placed on disability status, and should continue at active employee rates until Plaintiff reaches age 63, and thereafter at retired employee rates. Similarly, Plaintiff's medical and dental plans should continue at active employee rates until he reaches age 63, and thereafter as a retired employee. To the

extent that any of the fringe benefits mentioned thus far are normally made available to an employee's surviving spouse, they should continue to be made available to Plaintiff's spouse in the event of his demise.

■ Plaintiff has been receiving retirement benefits of $1,021 per month since he was discharged. According to Defendant, the continued receipt of these benefits, along with liquidated damages, would be a windfall. Thus, Defendant seeks to have this Court offset its damages by the amount of retirement benefits Plaintiff has been and will continue to receive. The Court is aware that courts in different circuits have reached different results. For example, in *Meschino v. I.T.T. Corp.*, 661 F.Supp. 254 (S.D.N.Y.1987), the district court ruled that pension benefits should be deducted from damages awards because "(b)y receiving benefits which he would not have received had he not been terminated, [the Plaintiff] was receiving compensation for his termination. There is no reason to require [Defendant] to pay twice for discriminating against [Plaintiff] ..." *Meschino*, 661 F.Supp., at 259.

■ However, this Circuit does not recognize the collection of pension benefits as compensation from the employer. Instead, this Circuit recognizes pension benefits as received from a collateral source, so that a Plaintiff's receipt of both pension benefits and damages for unlawful termination is not recognized as a "windfall" which would effectively double Plaintiff's damages. *Doyne v. Union Elec. Co.*, 953 F.2d 447, 451–52 (8th Cir.1992). "Pension benefits may be viewed as *earned* by the claimants, and therefore not paid by the employer at all." *E.E.O.C. v. O'Grady*, 857 F.2d 383, 391 (7th Cir.1988) (emphasis in original). In unlawful termination cases, the Defendant cannot, under Eighth Circuit precedent, offset the Plaintiff's damages with the amount of pension benefits Plaintiff has received. This is so on the ground that in these cases, the Plaintiffs are effectively forced to exhaust their plan benefits since, but-for the unlawful termination, they would have received regular wages. *Blake v. J.C. Penney*, 894 F.2d 274, 282 (8th Cir.1990), *citing Dickerson, supra,* 703 F.2d, at 279–80. This Court is persuaded that the amount of pension benefits which Plaintiff has received shall not be used to offset Defendant's damages obligation.

■ Shortly before trial, Plaintiff began receiving other benefits from the Defendant. These benefits included a lump-sum amount of long-term disability benefits averaging $3,002 per month, which was retroactive to September 1, 1991. These benefits were awarded under the terms of Defendant's long-term disability and supplemental long-term disability plans, both of which were in effect at the time of Plaintiff's termination and both of which were a part of the J.C. Penney benefit package which Plaintiff participated in (Plaintiff's Exhibit 1).

Unlike the pension benefits, these benefits would be awarded to Plaintiff whether he was unlawfully terminated or not. However, they would not be awarded on top of the Plaintiff's ordinary salary, which the back pay award is designed to compensate for. The testimony of Mr. Brewer was that the long-term disability was paid approximately three-fourths by the employer and one-fourth by the employee. Accordingly, Defendant should receive a credit of $2,250 per month (three-fourths of $3,000) for any long-term disability and supplemental long-term disability benefits which it provided to the Plaintiff as part of its benefits package. *Beshears v. Asbill,* 930 F.2d 1348, 1355, n. 11 (8th Cir.1991).

■ Since receiving the favorable ruling from the Secretary of Health and Human Services on his total disability claim, Plaintiff has also been receiving Social Security disability benefits which were made retroactive to the day he was discharged. Defendant seeks to offset its damages obligation to Plaintiff with the amount of those benefits. Plaintiff cites *Maxfield v. Sinclair Int'l,* 766 F.2d 788 (3d Cir.1985) for the proposition that if this Court were to off-set Plaintiff's damages with his Social Security disability benefits, the Court would effectively encourage employers to dismiss disabled employees.

*Maxfield* states that the overall justification for not providing a set-off against Social Security benefits is "compensating victims in a make whole fashion." *Maxfield,* 766 F.2d,

at 794. The Court finds *Maxfield*'s underlying rationale is less persuasive than the ruling articulated by the Massachusetts District Court in *Crosby v. New England Tel. & Tel., Co.*, 624 F.Supp. 487 (D.Mass.1985). Citing *Maxfield*, the *Crosby* Court concluded that when considering whether to offset Social Security benefits from a damages award, a district court should take into consideration whether the liquidated damages would make Plaintiff whole again if the disability benefits were not included. This Court notes that Plaintiff only sought Social Security disability benefits after he was terminated. Since back and front pay damages will effectively provide Plaintiff with the same income he would have received had he remained employed with Defendant until age 63, the Court is persuaded that those damage awards make him "whole." The Court is persuaded that the addition of the Social Security awards Plaintiff has already received and continues to receive would make him more than whole, in violation not only of the rational rule of *Crosby*, but also of the underlying rationale of *Maxfield*. Therefore, all such payments heretofore received from Social Security Disability shall be used to reduce the Defendant's damage obligation.

### e. Prejudgment Interest

"The ADEA does not indicate whether or not prejudgment interest may be awarded under the statute. The ADEA, however, is incorporated into the Fair Labor Standards Act (FLSA), 29 U.S.C. Sections 201, *et. seq.* It is settled that the FLSA does not permit successful plaintiffs to obtain prejudgment interest in addition to liquidated damages because that would enable them to obtain double recovery." *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1102 (8th Cir. 1982), *citing Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 715–16, 65 S.Ct. 895, 906, 89 L.Ed. 1296 (1945) and *Masters v. Maryland Mgt. Co.*, 493 F.2d 1329, 1334 (4th Cir.1974). *See also, McCann v. Texas City Refining, Inc.*, 984 F.2d 667, 673 (5th Cir. 1993). Therefore, the Court shall not award pre-judgment interest on Plaintiff's liquidated damages.

Plaintiff has not sought reinstatement with the Defendant and the Court is persuaded that reinstatement would not be appropriate. Therefore, the Court is not considering it in making its ruling.

**IT IS THEREFORE ORDERED** that the Plaintiff, Dale E. Nelson, based on the jury verdict in his favor on the age discrimination claim, shall have a front-pay award against the Defendant, J.C. Penney Company, in the amount of $569,503.20 and a back pay award of $703,064.50 (with no pre-judgment interest) less a set-off for Social Security disability payments Plaintiff has already received, and less $2,250 per month for Plaintiff's long-term disability benefits already received, plus interest as provided by law, reasonable attorney fees, and the costs of this action.

**IT IS FURTHER ORDERED** that post-judgment interest shall be added to both the front and back pay awards as provided by law.

**IT IS FURTHER ORDERED** that the Plaintiff shall cease receiving pension benefits between the period from the date of this Order until he reaches age 63 and will resume from that time until the time of the Plaintiff's death.

**IT IS FURTHER ORDERED** that within 20 days of the date of this Order, the Plaintiff shall file an accounting setting out all Social Security Disability payments that he has received since the date of the award of benefits from the Secretary of Health and Human Services and the Defendants shall file an accounting setting out all disability payments they have paid to the Plaintiff up to the date of this Order.

**IT IS FURTHER ORDERED** that the Court will set a hearing on Plaintiff's claim for attorney fees and costs at the Court's earliest convenience.

**IT IS FURTHER ORDERED** that the Plaintiff shall within 20 days of the date of this Order update the benefits he has received each year as shown by Exhibits U–3 and R–3A as they pertain to his projected Savings plan. The Defendant shall cooperate with the Plaintiff in calculating this figure.

**IT IS FURTHER ORDERED** that the Plaintiff will receive $8 for each month since his termination for an insurance differential.

Judgment shall be entered after the computation of interest, costs and attorney fees.